UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANK GENE BOWMAN,<br><br>                Petitioner,<br>v.<br><br>RICHARD A. RIMMER, Director of<br>Corrections,<br><br>           Respondent. | Case No. 03cv2224-BTM (BLM)<br><br>**REPORT AND RECOMMENDATION FOR<br>ORDER DENYING PETITION FOR<br>WRIT OF HABEAS CORPUS** |

    This Report and Recommendation is submitted to United States District Judge Barry Ted Moskowitz pursuant to 28 U.S.C. § 636(b) and Local Civil Rules 72.1(d) and HC.2 of the United States District Court for the Southern District of California.

    On November 10, 2003, Petitioner Frank Gene Bowman, a state prisoner, commenced these habeas corpus proceedings pursuant to 28 U.S.C. § 2254. Doc. No. 1. Petitioner appeared pro se for purposes of filing his petition and first amended petition, but the Court appointed counsel for Petitioner prior to the filing of his traverse. Doc. No. 19. Petitioner challenges his various convictions as well as his sentence of 302 years to life in prison.

///

1  This Court has considered Petitioner's first amended petition
2  ("Pet."), Respondent's answer[1] and accompanying memorandum ("Answer"),
3  and Petitioner's traverse ("Traverse").   For the reasons set forth
4  below, this Court **RECOMMENDS** that Petitioner's Petition for Writ of
5  Habeas Corpus be **DENIED**.

### FACTUAL BACKGROUND

7  The following facts are taken from the California Court of Appeal's
8  opinion in <u>People v. Bowman</u>, No. D028567, slip op. (Cal. Ct. App. March
9  18, 1999).   <u>See</u> Lodgment 1.   This Court presumes the state court's
10  factual determinations to be correct absent clear and convincing
11  evidence to the contrary.   28 U.S.C. § 2254(e)(1); <u>Miller-El v.
12  Cockrell</u>, 537 U.S. 322, 340 (2003); <u>see also</u> <u>Parke v. Raley</u>, 506 U.S.
13  20, 35-36 (1992) (holding findings of historical fact, including
14  inferences properly drawn from such facts, are entitled to statutory
15  presumption of correctness).
16  ///
17  ///
18  ///
19  ///
20  ///
21  ///

---

23  [1]   For purposes of clarification, the Court notes at this point the
24  designations it will use for the lodgments accompanying Respondent's answer.
   Respondent lodged a copy of the California Court of Appeal's unpublished decision and
25  Petitioner's petition for review to the California Supreme Court with this Court on
26  March 29, 2004.   The Court will refer to these documents as the "Lodgment."   On
   November 30, 2005, Respondent lodged additional documents with the Court, which the
27  Court will hereafter refer to as the "Supplemental Lodgment" or "Suppl. Lodgment."   The
28  California Court of Appeal's unpublished decision is lodged both at Lodgment 1 and
   Supplemental Lodgment 5.

03cv2224-BTM (BLM)

1

FACTS[2]

2       On November 14, 1996, Bowman, driving a 1972 Ford F-250
pickup truck, was stopped by an Escondido police officer for
3  driving with an expired registration.  Bowman gave the
officer an Oklahoma driver's license issued to Brian Bowman
4  (his brother) and told the officer he was visiting from
Oklahoma and staying with his brother Frank at 500 North
5  Grape Street, apartment 117, in Escondido.  He further
related he had borrowed the truck from Phil Fulcher, who had
6  a landscaping business on Richland Road in San Marcos.  The
officer gave Bowman a citation, which he signed in the name
7  of Brian Bowman.  The officer also impounded the truck.

8       Upon inspection, police found the vehicle identification
number (VIN) and federal label on the impounded truck had
9  been removed and the truck was displaying license plates that
did not belong to the vehicle; accordingly, the Regional Auto
10 Theft Team (RATT) was alerted.[3]  That evening, detectives went
to the North Grape Street apartment to look for Bowman.  No
11 one answered the door.  One police officer mistakenly entered
the apartment, but the police left without conducting a
12 search.

13      Early the next morning, Lynne Staten, who lived in the
apartment and formerly was Bowman's girlfriend, returned home
14 from work and called the police to report someone had entered
her apartment while she was gone.  The lead detective
15 returned to Staten's apartment and explained to Staten that
policed wanted to talk to Bowman.  The detective gave Staten
16 her business card and asked her to have Bowman contact the
police.  After the detective left, Staten discovered Bowman
17 hiding inside her waterbed.  Bowman asked if the police had
left and told her he was hiding from the police.  Staten gave
18 the detective's business card to Bowman.

19 ///

20

21      [2]   In addition to Bowman, Kurt Eric Grubaugh and Phillip Craig Fulcher were
charged with being members of the conspiracy, operating a chop shop, 14 counts of
22 unlawfully driving or taking a vehicle, 13 counts of tampering with vehicle
identification numbers and 15 counts of receiving stolen property.  Grubaugh pled no
23 contest to the face of the second amended information before trial commenced.  Fulcher,
who presented an affirmative defense, was acquitted of all charges except for one count
24 of receiving stolen property.  We set forth the facts only as they relate to Bowman,
the conspiracy and the chop shop operation.
25

26      [3]   The truck, which had an estimated value of $3,000, belonged to Bruce
Cochran, who reported it stolen on July 12, 1996.  Cochran's wallet, including his
27 driver's license, was in the truck when it was stolen.

28

3                                   03cv2224-BTM (BLM)

Later that day, police put the Richland Road property in San Marcos under surveillance and observed more than 20 vehicles on it, including older Ford pickup trucks, box trailers and utility trailers.

At about 7 a.m. on November 16, RATT detectives executed a search warrant on a suspected chop shop operation on the Richland Road property. Phillip Fulcher was inside the main residence with his girlfriend. After searching the residence, police attempted to enter a shed, but the door would not open and no one responded to police knocking and requests to enter. When the police finally forced the door open they found Bowman either asleep or passed out on a sofa in the middle of the shed. It took police about five minutes to wake up Bowman, and, after they handcuffed him and carried him outside, he immediately fell asleep again.

Inside the shed, police discovered a shotgun loaded with six shells, a loaded .12-gauge shotgun and a variety of ammunition. The .12-gauge shotgun, which was mostly covered with a gun sock, was protruding from the cushions of a second sofa. The .12-gauge shotgun was within a couple steps of Bowman's location. An unloaded .22-caliber rifle was found two steps behind Bowman's sofa, leaning against a post. The rifle had a scope, but the bolt and some screws were missing, rendering it inoperable. The police also found a briefcase filled with license plates, die stamping equipment used to imprint VIN numbers and registration tabs. Also there were vehicle repair manuals, a keyring full of Ford keys, and Ford logos.

Inside the shed, police found receipts, business cards and identification in the names of R. Grubaugh, William R. Grubaugh, Kurt Grubaugh and Sons. There was a traffic citation issued to Kurt Grubaugh.

The property itself was littered with vehicle parts, painting equipment and air compressors. In the garage, police found cutting torches, hand tools, grinders, paint sprayers, and a list of police radio codes. License plates, vehicle identification numbers, vehicle warranty plates and items belonging to some of the owners of stolen vehicles were in garbage cans.

The following vehicles were found on the Richland Road property with missing, defaced or switched parts and identification numbers:

- a 1984 Nissan pickup truck stolen from Cobblestone Golf Course on March 31, 1996, worth $1,000;

- a 1978 Ford F-350 pickup truck stolen from David Moreno on April 18, 1996, worth $7,500;

- a 1983 Ford F-350 pickup truck stolen from Fabia Alegro on October 24, 1996, worth $6,000;

4

- a 1989 Melroe Bobcat stolen from Terra Firma Landscape on July 23, 1996, worth $26,000;

- a two-axle water tank trailer stolen from Coast Equipment Rental on November 4, 1996, worth $2,000;

- a Melroe 753 BobCat stolen from Coast Equipment Rental on November 4, 1996, worth $9,000;

- a 1989 Wells Cargo one-axle trailer stolen from Mark Zwack on November 7, 1996, worth $1,800;

- a three-axle trailer with a 1981 Ford one-ton flatbed truck stolen from Martha Slusser on October 20, 1996, worth between $7,000 and $8,000;

- three, two-axle trailers without identification numbers; and

- an inoperable 1974 Ford pickup truck with the identification number cut out and the doors removed.

On November 17, sheriff deputies discovered an abandoned 1979 Ford F-600 tow truck about three miles from the Richland Road property; the ignition and license plates had been removed and there was no VIN number. The truck had been stolen from Norm's Auto Sales on October 24, 1996, and its estimated value was between $15,000 and $20,000. The side rails from the tow truck had been removed; these were found at the Richland Road property.

Also on that date, sheriff deputies found a 1991 Ford F-350 tow truck with a 1985 Ford F-350 pickup truck hooked up to it near a dead end road, about one mile from the Richland Road property. The tow truck and pickup had been stripped of their license plates and VIN numbers. The tow truck had been stolen from Western Towing on November 10, 1996 and was worth between $20,000 and $21,000. The doors, light bar and bumper for the tow truck were found on the Richland Road property. The pickup truck had been stolen from the Simo Sito Company on November 4, 1996; it was valued at $5,000. The registration card for the pickup truck was found in a garbage can on the Richland Road property.[4]

---

[4]   Police also found documents belonging to Lynne Staten and her grandfather inside a garbage can – this was the basis of Bowman's receiving stolen property conviction. Staten was in charge of her grandfather's finances, and she and her grandfather were the only ones authorized to have possession of the documents. In August 1996, Staten was unable to locate the documents and asked Bowman if he knew where they were. Bowman said he did not. Staten froze her grandfather's account and nothing was stolen from it. Until August 1996, Bowman lived with Staten. That month,

On November 19, detectives observed a Ford flatbed truck with no VIN parked in front of Kurt Grubaugh's Oceanside residence. Grubaugh left his residence and drove away in the truck; the detectives followed and contacted the California Highway Patrol. After a high speed chase through Carlsbad, Grubaugh jumped out of the moving vehicle and attempted to hide, but was apprehended. The truck had been "cold-plated," which means the license plates had been replaced with "clean" plates, to avoid detection. The truck had been stolen from Pressley Homes on June 22, 1996 and was worth $9,000.

The side rails for a 1979 Ford F-600 tow truck that had been stolen on October 24, 1996 were found at the Richland Road property. The truck itself was at a tow yard; the VIN number had been removed and the ignition was missing.

David Fulcher, the owner of the Richard (sic) Road property, rented the main house to his brother, Phillip Fulcher, and the yard of the property and the shed to Kurt Grubaugh. David Fulcher, who left the area in August 1996, had not seen Bowman on the property before his departure.

Sierra Fulcher, David Fulcher's daughter who was living on the property in 1996, testified she believed the first time she saw Bowman on the property was in October 1996, when he was talking to Grubaugh; Bowman was not working on the vehicles at the time. Subsequently, Sierra saw him on the property a few times working on the vehicles.

Staten testified she had observed Bowman driving Cochran's stolen truck for one to one-and-one-half months before November 14, 1996. Staten had told the RATT detective in November that she had seen Bowman driving the truck for a few months.

In late January 1997, David Fulcher found three wallets in a garage on his property. One of the wallets belonged to Bruce Cochran. Another wallet contained an Oklahoma driver's license in the name of Brian Bowman, which was the same driver's license Bowman showed to the police officer who stopped him on November 14, 1996.

Bowman stipulated he was a convicted felon on November 16, 1996.

Lodgment 1 at 4-10.

---

they had a heated argument and Staten asked Bowman to move out. He grabbed his belongings, threw them into a bag and left. When the argument between them occurred, some of the documents were on a breakfast bar and some were in the bedroom under the mattress. Initially, Staten did not report the documents stolen because she thought they were misplaced.

03cv2224-BTM (BLM)

## PROCEDURAL BACKGROUND

### A.   Petitioner's Conviction

On February 5, 1997, the District Attorney of San Diego County filed a Second Amended Information charging Petitioner with forty-six counts.[5]  Suppl. Lodgment 1 (Clerk's Transcript), vol. 1 at 28-46. Specifically, Petitioner was charged with fourteen counts of unlawful driving or taking of a vehicle in violation of California Vehicle Code ("VC") § 10851(a), thirteen counts of tampering with vehicle identification numbers ("VIN") in violation of VC § 10802, fifteen counts of receiving stolen property in violation of California Penal Code ("PC") § 496(a), one count of conspiracy to commit the crime of unlawfully driving or taking a vehicle in violation of PC § 182(a)(1), one count of owning and operating a chop shop in violation of VC § 10801, one count of false personation in violation of PC § 529.3, and one count of possession of a firearm by a felon in violation of PC § 12021(a)(1).  Id.  The Second Amended Information further alleged that Petitioner was armed with a firearm within the meaning of PC § 12022 during the commission of the conspiracy, nine of the charged instances of receiving stolen property, the operation of the chop shop, and one of the charged instances of tampering with a VIN.  Id.  An added enhancement was alleged as to each violation of VC § 10851(a) (unlawfully driving or taking a vehicle) because it was alleged that the aggregate loss to the victims from all the charges exceeded fifty thousand dollars, within the meaning of PC § 12022.6(a).  Id.  Finally, the Second Amended Information alleged that Petitioner had three prison

---

[5]     Phillip Craig Fulcher and Kurt Eric Grubaugh were also charged with many of the same counts in the Second Amended Information.  Suppl. Lodgment 1, vol. 1 at 28-46.

prior convictions within the meaning of PC § 667.5(b) and fourteen prior convictions of serious and violent felonies and juvenile adjudications. Id.

Petitioner's criminal trial began on March 3, 1997. Id. at 267. On March 18, 1997, the trial court granted Petitioner's unopposed motion to dismiss count 30 (false personation). Suppl. Lodgment 2 (Reporter's Transcript), vol. 9 at 1149-50. On March 21, 1997, a jury found Petitioner guilty of fourteen counts of unlawful driving or taking of a vehicle in violation of VC § 10851(a), thirteen counts of tampering with vehicle identification numbers in violation of VC § 10802, one count of receiving stolen property in violation of PC § 496(a), one count of conspiracy to commit the crime of unlawfully driving or taking a vehicle in violation of PC § 182(a)(1), one count of owning and operating a chop shop in violation of VC § 10801, and one count of possession of a firearm by a felon in violation of PC § 12021(a)(1). Suppl. Lodgment 1, vol. 2 at 296-343; Suppl. Lodgment 2, vol. 12 at 1468-86, 1492-94.

In a bifurcated proceeding on the Second Amended Information's prior convictions allegations, the court found the third alleged prison prior (pursuant to PC § 667.5(b)) and the fourteen alleged prior serious and violent felony convictions (pursuant to PC § 667(b)-(I)) to be true. Suppl. Lodgment 1, vol. 2 at 345; Suppl. Lodgment 2, vol. 13 at 1510-14. On April 21, 1997, the trial court imposed a total sentence of 402 years to life, which was comprised of consecutive sentences of (1) twenty-five years to life for each of the fourteen counts of unlawful driving or taking of a vehicle in violation of VC § 10851(a), (2) twenty-five years to life for the count of possession of a firearm by a felon in violation of PC § 12021(a)(1), (3) twenty-five years to life for the count of

8

03cv2224-BTM (BLM)

receiving stolen property in violation of PC § 496(a), (4) one year for the added enhancement to the "principal count" (count 2 – unlawful driving or taking of a vehicle in violation of VC § 10851(a)) for loss exceeding $50,000 in violation of PC § 12022.6(a), and (5) one year for the added enhancement for a prison prior pursuant to PC § 667.5(b).[6] Suppl. Lodgment 1, vol. 2 at 349-51; Suppl. Lodgment 2, vol. 14 at 38-39.   The trial court also ordered Petitioner to pay a restitution fine of $10,000.00 and reserved the order of any additional restitution for a later determination by the court.  Suppl. Lodgment 1, vol. 2 at 348; Suppl. Lodgment 2, vol. 14 at 39.

**B.   Direct Appeal**

Petitioner appealed to the California Court of Appeal, Fourth Appellate District, Division One.   Suppl. Lodgment 3 (Appellant's Opening Brief).  In an unpublished opinion filed on March 18, 1999, the California Court of Appeal reversed four of the convictions for driving or taking a vehicle, ordered the sentence reduced to 302 years to life, and otherwise affirmed the conviction.  Lodgment 1.  Petitioner then filed a petition for review in the California Supreme Court (Suppl. Lodgment 6), which was summarily denied without citation of authority on June 23, 1999 (Suppl. Lodgment 7).

**C.   Collateral Review**

Petitioner has not sought collateral review of his conviction in the state courts.

On February 1, 2004, Petitioner filed the instant First Amended

---

[6]      The trial court stayed Petitioner's sentence pursuant to PC § 654 as to the conspiracy and chop shop convictions as well as the armed enhancements thereto.  Suppl. Lodgment 1, vol. 2 at 349-51; Suppl. Lodgment 2, vol. 14 at 38-39.   The thirteen convictions for tampering with VINs as well as the remaining enhancements for loss exceeding $50,000 were also stayed.  Id.

Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254.  Doc. No. 6.  Respondent filed a motion to dismiss the First Amended Petition for failure to comply with the one-year statute of limitations set forth in section 2244(d) of the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214.  Doc. No. 10. Petitioner filed a brief opposition to the motion, arguing that the limitations period should be equitably tolled because Petitioner had been suffering from depression and, therefore, was unable to meet the filing deadline.  Doc. No. 15.  On January 20, 2005, the district judge denied the motion to dismiss, finding that in light of Petitioner's allegations of mental illness, the more appropriate course of action was to develop the record in order to determine whether Petitioner did, in fact, suffer from mental illness and, if so, whether he was entitled to equitable tolling of the statute of limitations.  Doc. No. 17.

On May 23, 2005, the magistrate judge[7] appointed Federal Defenders as counsel for Petitioner.  Doc. No. 19.  The Court then scheduled an evidentiary/competency hearing for August 4, 2005, set deadlines for propounding and responding to discovery on this issue, and ordered the parties to file supplemental briefing regarding Petitioner's competency. Doc. No. 20.  The case proceeded.

The case subsequently was transferred to this Court.  Following two telephonic case management conferences with counsel, the Court approved the parties' stipulation as to the following: (1) Respondent would withdraw his motion to dismiss, without prejudice to later renewing the motion, (2) Petitioner would withdraw his request for a writ of habeas corpus ad testificandum, (3) the parties would not object to the Court

---

[7]    This case was assigned to Magistrate Judge James F. Stiven until it was reassigned to this Court by ordered dated September 30, 2005.  See Doc. No. 38.

1  vacating the evidentiary hearing set for November 15, 2005, (4)
2  Respondent would file an answer to the First Amended Petition, and (5)
3  Petitioner would then file a traverse thereto.    Doc. No. 43.
4  Accordingly, the Court vacated the September 29, 2005 Order directing
5  issuance of a writ of habeas corpus ad testificandum and set dates for
6  filing of the answer and traverse. See id.

7      Respondent timely filed an Answer on December 21, 2005. Doc. Nos.
8  51-52. After being granted several extensions of time, Petitioner filed
9  a traverse on August 21, 2006 (Doc. No. 63) and the Court took the
10 matter under submission.

11                     **STANDARD OF REVIEW**

12     Title 28 of the United States Code, section 2254(a), sets forth the
13 following scope of review for federal habeas corpus claims:

14         The Supreme Court, a Justice thereof, a circuit
           judge, or a district court shall entertain an
15         application for a writ of habeas corpus in behalf
           of a person in custody pursuant to the judgment of
16         a State court only on the ground that he is in
           custody in violation of the Constitution or laws or
17         treaties of the United States.

18 28 U.S.C. § 2254(a).

19     The Petition was filed after enactment of AEDPA.  Under 28 U.S.C.
20 § 2254(d), as amended by AEDPA:

21         (d)   An application for a writ of habeas
           corpus on behalf of a person in custody pursuant to
22         the judgment of a State court shall not be granted
           with respect to any claim that was adjudicated on
23         the merits in State court proceedings unless the
           adjudication of the claim—
24
           (1)  resulted in a decision that was contrary
25         to, or involved an unreasonable application of,
           clearly established Federal law, as determined by
26         the Supreme Court of the United States; or

27         (2)  resulted in a decision that was based on
           an unreasonable determination of the facts in light
28         of the evidence presented in the State court
           proceeding.

                              11

28 U.S.C. § 2254(d).  Summary denials do constitute adjudications on the merits.  See Luna v. Cambra, 306 F.3d 954, 960 (9th Cir. 2002).  Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision.  Ylst v. Nunnemaker, 501 U.S. 797, 801-06 (1991).

A state court's decision is "contrary to" clearly established federal law if the state court: (1) "arrives at a conclusion opposite to that reached" by the Supreme Court on a question of law; or (2) "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court's]."  Williams v. Taylor, 529 U.S. 362, 405 (2000).

A state court's decision is an "unreasonable application" of clearly established federal law where the state court "identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003).  "[A] federal habeas court may not issue a writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly . . . .  Rather, that application must be objectively unreasonable."  Andrade, 538 U.S. at 75-76 (emphasis added) (internal quotation marks and citations omitted).  Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the United States Supreme] Court's decisions."  Williams, 529 U.S. at 412.

Finally, habeas relief is also available if the state court's adjudication of a claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court."  28 U.S.C. § 2254(d)(2).  A state court's

1  decision will not be overturned on factual grounds unless this Court
2  finds that the state court's factual determinations were objectively
3  unreasonable in light of the evidence presented in the state court
4  proceeding. See Miller-El, 537 U.S. at 340. This Court will presume
5  that the state court's factual findings are correct, and Petitioner may
6  overcome that presumption only by clear and convincing evidence. 28
7  U.S.C. § 2254(e)(1).

8                          **DISCUSSION**

9       Petitioner raises eight claims in his habeas petition, which may
10 be grouped as claims that (1) dispute the sufficiency of the evidence,
11 (2) allege that Petitioner was denied due process, and (3) challenge
12 Petitioner's sentence.

13     A.    **Sufficiency of the Evidence (claims one, three, four and**
14           **five)**

15      Petitioner argues that insufficient evidence supports his
16 convictions for (1) conspiracy, (2) the underlying offenses for which
17 he was found vicariously liable as a member of the conspiracy, (3) the
18 armed enhancements to Petitioner's conspiracy and chop shop offense
19 convictions, and (4) being a felon in possession of a firearm. Pet. at
20 6, 8-10a, App. B at 1-3, 6-10; Traverse at 2-9, 13-20. Respondent
21 contends that the appellate court's decision as to Petitioner's first
22 claim was not contrary to, or an unreasonable application of, clearly
23 established Supreme Court precedent. Id. at 12. As to the remaining
24 sufficiency of the evidence claims, Respondent asserts that Petitioner's
25 claims fail to state federal claims and are unexhausted. Answer at 8-
26 18.

27      The clearly established Supreme Court law regarding sufficiency of
28 the evidence claims is set forth in Jackson v. Virginia, 443 U.S. 307,

                                    13

1  319 (1979).   In <u>Jackson</u>, the Supreme Court held that the Fourteenth
2  Amendment's Due Process Clause is violated if, viewing the evidence in
3  the light most favorable to the prosecution, "no rational trier of fact
4  could have found proof of guilt beyond a reasonable doubt."   <u>Jackson</u>,
5  443 U.S. at 324; <u>Juan H. v. Allen</u>, 408 F.3d 1262, 1274 (9th Cir. 2005).
6  Moreover, the Supreme Court made clear that due process requires a
7  showing of "evidence necessary to convince a trier of fact beyond a
8  reasonable doubt of the existence of *every element* of the offense"
9  (emphasis added).   <u>Id.</u> at 316 (citing <u>In re Winship</u>, 397 U.S. 358
10 (1970)).   On habeas review, the Ninth Circuit has concluded that
11 "[a]fter AEDPA, we apply the standards of *Jackson* with an additional
12 layer of deference."   <u>Juan H.</u>, 408 F.3d at 1274.

13         **1.   Sufficiency of the Evidence of Conspiracy**

14         In challenging his conspiracy conviction, Petitioner raises two
15 related sufficiency of the evidence claims.   First, Petitioner argues
16 that the state failed to present sufficient evidence that he had both
17 the specific intent to agree to the conspiracy and the specific intent
18 to commit the object of the conspiracy (violation of VC § 10851).   Pet.
19 at 6-6a, App. B at 1-3; Traverse at 2-7.   Second, Petitioner argues that
20 the evidence as to all but one of his convictions under California
21 Vehicle Code § 10851 is insufficient because there is no evidence that
22 he personally participated in any of the vehicle takings and there is
23 insufficient evidence to support vicarious liability based upon his
24 conspiracy conviction.   Traverse at 13.   As to the latter contention,
25 Petitioner submits that his convictions under a vicarious liability
26 theory cannot stand because the offenses preceded the first overt act
27 alleged in the information and found by the jury.   <u>Id.</u>
28 ///

14

In order for the jury to convict Petitioner of conspiracy, it was required to find: (1) that he specifically intended to agree with one or more persons to commit a crime, (2) that he specifically intended to commit the underlying offense or object of the conspiracy, and (3) that one or more of the alleged conspirators committed some overt act in furtherance of the conspiracy.  Cal. Penal Code §§ 182, 184; People v. Swain, 12 Cal. 4th 593, 600 (1996).

### a.   Intent to Agree to the Conspiracy (claim one)

Respondent does not dispute that Petitioner raised his first claim for relief in his petition for review on direct appeal to the California Supreme Court and that it is, therefore, exhausted.[8]  Answer at 8-9; see also Johnson v. Zenon, 88 F.3d 828, 829 (9th Cir. 1996) (citing Anderson v. Harless, 459 U.S. 4, 6 (1982) and Picard v. Connor, 404 U.S. 270, 275 (1971)) (for exhaustion purposes, Petitioner must have "fairly presented" his federal claim to the highest state court with jurisdiction to consider it).  Because the California Supreme Court summarily denied Petitioner's petition for review on direct appeal (Suppl. Lodgment 7), this Court must look through to the last reasoned state court decision.  See Ylst, 501 U.S. at 801-06.  Here, the last reasoned state court decision came from the California Court of Appeal.  Lodgment 1.  Applying the standard of review set forth in People v. Johnson, 26 Cal. 3d 557, 578 (1980) for sufficiency of the evidence claims[9], the appellate court found that the jury could reasonably

---

[8]    Respondent also acknowledges that Petitioner properly raised a federal question both in his petition for review by the California Supreme Court and in his petition before this Court by citing to Jackson v. Virginia, 443 U.S. 307 (1979). Answer at 8-9.

[9]    The standard set forth in Johnson mirrors and, in fact, cites to the standard set forth in Jackson.  Johnson, 26 Cal. 3d at 562, 575-78.

conclude there was an agreement to unlawfully drive or take vehicles. Id. at 11-15.

Petitioner contends that the prosecution presented insufficient evidence that Petitioner agreed to participate in the conspiracy. In evaluating whether or not Petitioner was a member of the conspiracy, the jury was required to decide "whether he [] willfully, intentionally and knowingly joined with any other or others in the alleged conspiracy." California Jury Instructions, Criminal ("CALJIC") No. 6.22.   Under California law,

> The formation and existence of a conspiracy may be inferred from all circumstances tending to show the common intent and may be proved in the same way as any other fact may be proved, either by direct testimony of the fact or by circumstantial evidence, or by both direct and circumstantial evidence. It is not necessary to show a meeting of the alleged conspirators or the making of an express or formal agreement.

CALJIC No. 6.12; see People v. Vu, 143 Cal. App. 4th 1009, 1024-1025 (4th Dist. 2006) ("To prove an agreement, it is not necessary to establish the parties met and expressly agreed; rather, 'a criminal conspiracy may be shown by direct or circumstantial evidence that the parties positively or tacitly came to a mutual understanding to accomplish the act and unlawful design.'").  However, "[e]vidence that a person was in the company of or associated with one or more other persons alleged or proved to have been members of a conspiracy is not, in itself, sufficient to prove that person was a member of the alleged conspiracy." CALJIC No. 6.13.  Likewise, "[e]vidence of the commission of an act which furthered the purpose of an alleged conspiracy is not, in itself, sufficient to prove that the person committing the act was a member of the alleged conspiracy." CALJIC No. 6.18.

///

16

1   The Court of Appeal concluded that the record contained sufficient
2   evidence of Petitioner's specific intent to agree to the conspiracy to
3   unlawfully drive or take vehicles based upon the following evidence:

> It was eminently reasonable for the trier of fact to
> conclude the Richland Road property was the repository for
> stolen vehicles, given the high number of stolen vehicles
> found there with altered identification. Grubaugh rented the
> Richland Road repository as well as the shed where various
> tools and materials used to conceal the vehicles'
> identification were kept. Both Grubaugh and Bowman were
> directly linked to stolen vehicles they drove and were
> observed working on various stolen vehicles on the Richland
> Road property. Bowman's efforts to elude the police showed
> a consciousness of guilt of his knowledge of and involvement
> in the stolen vehicle operation at the Richland Road
> property.

11  Lodgment 1 at 13. Accordingly, the court concluded that "[g]iven the
12  totality of the evidence, the jury could reasonably conclude there was
13  an agreement to unlawfully take or drive vehicles and Bowman was a party
14  to it." Id.

15      With regard to the appellate court's first three findings,
16  Petitioner disputes that these facts have any bearing on Petitioner's
17  intent to agree. Traverse at 3. Analogizing to the facts of United
18  States v. Vasquez-Chan, 978 F.2d 546, 553 (9th Cir. 1992), Petitioner
19  argues that his presence on property where illegal activity occurred and
20  his association with one of the wrongdoers (Grubaugh) is insufficient
21  evidence that he knowingly agreed to participate in the conspiracy. Id.
22  In Vasquez-Chan, two women, Vasquez and Gaxiola, were convicted of
23  possession of cocaine with intent to distribute, aiding and abetting,
24  and conspiracy. Vasquez-Chan, 978 F.2d at 550. Vasquez was employed
25  as a caretaker for the house where agents found large amounts of cocaine
26  and her name appeared on an electric bill sent to the house, but she did
27  not have any ownership or lessee interests in the home. Id. She knew
28  the cocaine was in the house and was present on at least one occasion

17

1    when a messenger delivered cocaine to the house. Id. However,
2    investigators did not find her fingerprints on any of the cocaine
3    containers and the other conspirators never mentioned her name while
4    they were under government surveillance. Id. The other woman, Gaxiola,
5    stated during interrogation that she was visiting Vasquez and staying
6    in the back bedroom of the house for a few weeks – the bedroom where the
7    cocaine was stored. Id. at 549. Gaxiola's fingerprints were found on
8    several of the cocaine containers, including on the inside cover of one,
9    but she too was never mentioned by the other conspirators during any of
10   the negotiations. Id. at 550. In reversing the convictions on direct
11   appeal, the Ninth Circuit noted that mere proximity to the contraband,
12   the defendants' presence on the property where it was located, and their
13   association with the person who controlled it was insufficient to
14   support a conspiracy or possession conviction. Id. Furthermore, the
15   Ninth Circuit explained that "[w]hen there is an innocent explanation
16   for a defendant's conduct as well as one that suggests that the
17   defendant was engaged in wrongdoing, the government must produce
18   evidence that would allow a rational jury to conclude beyond a
19   reasonable [doubt] that the latter explanation is the correct one." Id.
20   at 551.

21       Here, unlike in Vasquez-Chan[10], the Richland Road property was not

22   _____

23       [10]    As set forth in the body of this order, the Court finds that the facts of
     Petitioner's case are sufficiently different from those in Vasquez-Chan to justify the
24   contrary result reached by the appellate court in Petitioner's case. However, the
     court also notes that Vasquez-Chan involved a direct review of the sufficiency of the
25   evidence, whereas Petitioner's sufficiency of the evidence claim currently is presented
     for habeas review. As a result, the review of the evidence in Petitioner's case
26   requires an "additional layer of deference" to the appellate court's decision, which
27   was not applicable in Vasquez-Chan. This additional level of deference further
28   supports this Court's determination that the appellate court's decision was not

                                                    03cv2224-BTM (BLM)

simply a storage site for stolen vehicles.  It was the locus of the chop shop operation where the conspirators actively worked to conceal the identities of the stolen vehicles.  Detective Chamberlain testified that the Richland Road property was littered with vehicles in various stages of concealment and VIN-switching.  See Suppl. Lodgment 2, vol. 6 at 769 -836, vol. 7 at 879-911.  Some vehicles' VINs had been scratched, melted or cut off, others displayed more than one VIN (additional VINs having been welded or stamped on to the vehicle), and one other was found with pieces of the manufacturer's identification label lying on the ground next to the vehicle (Suppl. Lodgment 2, vol. 6 at 817-18).  Id.  Several of the trucks had wires hanging down under the dash, which according to Detective Chamberlain, suggested that they had been hot-wired to start. Id. at 775, 783, 787-88.  The shed in which Petitioner was found asleep contained in plain view die stamping materials for making VIN plates, a ring of Ford and padlock keys, a box containing hundreds of random keys, a briefcase full of license plates, registration tags, automotive maintenance manuals (including several specific to Ford vehicles), acetylene torches (which are powerful enough to cut a vehicle in half), and a GM-type ignition.  Suppl. Lodgment 2, vol. 4 at 519-33, vol. 5 at 569-577, vol. 7 at 880-82.  Trash cans scattered throughout the property yielded blank Department of Motor Vehicle ("DMV") bill of sale and release of ownership forms, metal VIN plates, two license plates, a warranty plate, and the DMV registration form for the 1985 Ford truck stolen from Simo Sito Corporation.  Suppl. Lodgment 2, vol. 5 at 581- 587.  This evidence strongly supports the inference that Petitioner knew about the conspiracy.  The fact that Petitioner worked on the Richland Road property for over three months supports the inference that

contrary to nor an unreasonable application of clearly established federal law.

Petitioner agreed to be part of the conspiracy.

Furthermore, while Petitioner suggests that there was an innocent explanation for the fact that he was seen working on the stolen vehicles (that he was employed as a mechanic to fix the vehicles and did not know they were stolen), he was not the passive visitor or innocent laborer described in Vasquez-Chan.  Elizabeth Reyes (Fulcher's neighbor) and another witness, Patrick Mc Coy, saw Petitioner working on trucks in the garage, which was found to contain cutting torches, grinders, the wallets of several of the vehicle theft victims, and federal labels. See Suppl. Lodgment 2, vol. 7 at 987-88, 996-99.  A list of police codes (also known as "10 codes") found in the same garage (suppl. lodgment 2, vol. 5 at 579) suggests a conscious effort by the conspirators to monitor police communications and elude capture.  Both Sierra Fulcher and Elizabeth Reyes testified that they personally witnessed Petitioner painting a truck on the property.  Suppl. Lodgment 2, vol. 6 at 742, vol. 7 at 999.  Moreover, Petitioner's explanation is simply implausible because it unrealistically presumes that a mechanic's suspicions would not be raised when he was asked to repaint and otherwise work on vehicles that had wires hanging out under the dash (suggesting hot-wiring), were missing VINs and/or federal labels, and/or displayed marred or contradictory VINs.  This is particularly true where the property on which he worked and the shed in which he slept were littered with the indicia of a chop shop operation.  Thus, unlike in Vasquez-Chan, the evidence submitted at trial did "include sufficient probative facts from which a rational factfinder, applying the reasonable doubt standard, could choose the hypothesis that supports a finding of guilt rather than hypotheses that are consistent with innocence."  Vasquez-Chan, 978 F.2d at 553 (quoting United States v. Bishop, 959 F.2d 820,

1   830 (9th Cir. 1992)).

2       Petitioner next posits that even if this evidence is sufficient to
3   show that he was involved in illegal activity or even a conspiracy, the
4   crime it points to is an agreement to receive stolen property, not an
5   agreement to unlawfully take and drive vehicles.[11]   Traverse at 3.   A
6   defendant cannot be imprisoned for violating one crime simply because
7   he may be guilty of another.   See Goldyn v. Hayes, 444 F. 3d 1062, 1070
8   (9th Cir. 2006).   However, Petitioner's conclusion ignores the evidence
9   cited by the Court of Appeal that Petitioner was actually stopped by a
10  police officer while *driving* a stolen vehicle which, like the other
11  vehicles found on the property, was missing its VIN and federal label
12  and bore license plates belonging to another vehicle.[12]   Likewise,
13  police apprehended his co-conspirator, Grubaugh, while he was *driving*
14  a stolen vehicle.   Lodgment 1 at 9.   One theft victim also testified he
15  saw Grubaugh working near the victim's truck and the truck was stolen
16  immediately thereafter (victim saw Grubaugh on Friday, the truck was
17  missing when he arrived back at work on Monday).   Suppl. Lodgment 2,

18

19      [11]     Notably, the district attorney in this case in fact charged Petitioner on
20  alternate theories of receiving stolen property and unlawfully driving or taking a
21  vehicle. The jurors were instructed that they could not convict on both bases. Suppl.
22  Lodgment 1, vol. 1 at 114. The jury acquitted Petitioner of the receiving stolen
    property crimes. Suppl. Lodgment 1, vol. 2 at 301, 304, 307, 310, 313, 316, 319, 321,
23  324, 327, 329, 332, 335, 338, 341.

24      [12]     The condition of the truck Petitioner was driving links him to the Richland
25  Road property and Grubaugh. Officer Provost testified that the public VIN on the truck
    Petitioner was driving had been either "scratched" or "burned" off (Suppl. Lodgment 2,
26  vol. 4 at 497) and the federal label had been "scraped off" (id. at 498). Tools for
27  scratching, burning, and scraping metal were found at the Richland Road property leased
28  by Grubaugh and other vehicles on the property were similarly defaced. Lodgment 1 at
    7-9.

21

1 vol. 3 at 321, 326-29.  Police later recovered it following the high
2 speed chase with Grubaugh.  See Suppl. Lodgment 2, vol. 4 at 439-58.
3 In light of all of this evidence, a rational trier of fact could
4 conclude that Petitioner was a knowing and willing participant in an
5 agreement to take and drive vehicles belonging to others, without their
6 consent, with the specific intent to permanently deprive the owners of
7 title and possession (the elements of unlawful vehicle taking under
8 California Vehicle Code § 10851).

9       Viewing the evidence in the light most favorable to the
10 prosecution, the Court finds that a rational trier of fact could have
11 found beyond a reasonable doubt that Petitioner intentionally and
12 knowingly participated in a conspiracy to violate California Vehicle
13 Code § 10851.  See Jackson, 443 U.S. at 324; Vasquez-Chan, 978 F.2d at
14 549.  An agreement to conspire may be inferred from "the conduct,
15 relationship, interests, and activities of the alleged conspirators
16 before and during the alleged conspiracy." People v. Rodrigues, 8 Cal.
17 4th 1060, 1135 (1994) (quoting People v. Cooks, 141 Cal. App. 3d 224,
18 311 (1983)); United States v. Garcia-Guizar, 160 F.3d 511, 517 (9th Cir.
19 1998) ("[A] defendant's knowledge of and participation in a conspiracy
20 may be inferred from circumstantial evidence and from evidence of the
21 defendant's actions").  As the Court of Appeal explained, direct and
22 circumstantial evidence showed that Petitioner worked on stolen cars
23 with Grubaugh, worked on property leased by Grubaugh that served as a
24 repository for stolen vehicles - both before and after being stopped
25 while driving a stolen vehicle, and that he expressly eluded police
26 after this stop.  Lodgment 1 at 13.  Collectively, this evidence
27 supports the finding that Petitioner knowingly entered the charged
28 conspiracy with at least Grubaugh.  Accordingly, the Court finds that

the Court of Appeal did not unreasonably apply <u>Jackson</u> in finding sufficient evidence that Petitioner intentionally agreed to enter into a conspiracy to unlawfully take and drive vehicles in violation of California Vehicle Code § 10851). <u>See</u> 28 U.S.C. 2254(d)(1); <u>Andrade</u>, 538 U.S. at 75-76.

### b. Intent to Commit Object of the Conspiracy - Unlawfully Driving or Taking a Vehicle (claim one)

As with the first aspect of claim one, Respondent does not dispute that this claim is exhausted. Answer at 8-9. On review, this Court must once again look through to the opinion of the California Court of Appeal as the last reasoned state court decision. <u>See Ylst</u>, 501 U.S. at 801-06. The California Court of Appeal concluded that there was sufficient evidence of Petitioner's specific intent to unlawfully drive or take a vehicle. Lodgment 1 at 14.

Petitioner disputes the appellate court's finding that the record contains sufficient evidence of his intent to commit the object of the conspiracy to support his fourteen convictions for unlawfully driving or taking a vehicle. Traverse at 7-10. A conviction under California Vehicle Code § 10851 requires a showing that (1) the defendant drove or took a vehicle belonging to another person, (2) the other person had not consented to the driving or taking of his or her vehicle, and (3) when defendant drove or took the vehicle, he had the specific intent to deprive the owner either permanently or temporarily of his or her title to, or possession of, the vehicle. CALJIC No. 14.36.

In denying Petitioner's claim, the appellate court cited the following evidence in finding that sufficient evidence of Petitioner's intent existed in the record:

> Here, the alteration of VIN numbers and other methods to conceal the true identification of stolen vehicles manifested

23

> the specific intent to permanently deprive the rightful
> owners of title and possession. Also, Bowman's actions after
> the traffic stop for expired registration demonstrating (sic)
> a consciousness of guilt support an inference of the
> requisite specific intent for Vehicle Code section 10851.

Lodgment 1 at 14. As previously explained, this Court's proper role on habeas review is to determine whether or not the Court of Appeal unreasonably applied <u>Jackson</u> in concluding that sufficient evidence supported the jury's finding that Petitioner had the requisite specific intent to deprive the owners either permanently or temporarily of title to, or possession of, their vehicles. <u>See</u> 28 U.S.C. 2254(d)(1); <u>Andrade</u>, 538 U.S. at 75-76.

Here, Petitioner challenges the Court of Appeal's first factual basis for supporting the conviction on the grounds that there was no evidence that Petitioner was involved in the alteration of vehicle identification numbers or even had knowledge that the identification numbers had been removed from the vehicles. Traverse at 7. While it may be true that no direct evidence unequivocally proved that Petitioner personally altered VINs, a rational trier of fact could find that circumstantial evidence in the record showed that Petitioner not only knew that VINs were being altered or removed to conceal the vehicles' identities but that he actively participated in this effort. Once again, the elements of conspiracy "are sufficiently met by circumstantial evidence." <u>People v. Herrera</u>, 70 Cal. App. 4th 1456, 1464 (4th Dist. 1999): <u>Garcia-Guizar</u>, 160 F.3d at 517. The circumstantial evidence presented in this case showed that Petitioner worked on vehicles at the Richland Road address over the course of several months and had at his disposal all the tools necessary to scratch, melt, gouge, cut out or otherwise obscure a metal VIN. Lodgment 1 at 7-9; Suppl. Lodgment 2, vol. 5 at 578, vol. 6 at 742, vol.

7 at 881.  Police discovered him driving a stolen truck with a missing VIN and later found him asleep in a shed containing die stamping equipment used to create false VINs.  Lodgment 1 at 4-6.  Numerous vehicles on the Richland Road property - again, the property where several witnesses observed him working on vehicles - had either missing or altered VINs.  Id. at 7-8.  The chain of logic leading from this evidence to the inference that Petitioner knew that VINs were being altered to conceal the identity of the vehicles (or that he, in fact, personally altered the VINs) is not so attenuated as to be unreasonable. See Juan H., 408 F.3d at 1277 ("[a]lthough we must draw all reasonable inferences in favor of the prosecution, a 'reasonable' inference is one that is supported by a chain of logic").  Likewise, a rational trier of fact could reasonable infer that a defendant who knew of, or participated in, a scheme to alter VINs and otherwise conceal stolen vehicles' identities specifically intended to permanently or temporarily deprive the owners of title or possession of those vehicles.

Turning to the appellate court's second offer of factual support for the jury's verdict, Petitioner argues that his actions after the traffic stop for expired registration do not give rise to an inference of guilt because the officers did not advise him that he was suspected of conspiring to drive or take vehicles in violation of California Vehicle Code § 10851.  Traverse at 7-8.  Petitioner cites to Supreme Court precedent holding that flight does not necessarily lead to an inference of guilt.  Id. (citing Wong Sun v. United States, 371 U.S. 471, 482-83 (1963) and Alberty v. United States, 162 U.S. 499, 511 (1896)).  But this Court's review is not focused on whether other inferences were possible but on whether a rational trier of fact could have reasonably inferred that Petitioner's actions showed a specific

1  intent to drive or take vehicles.  As discussed above, such a fact-
2  finder could make this inference.

3      While Petitioner analogizes to Juan H. for the proposition that
4  there must be an unbroken inference demonstrating consciousness of guilt
5  of the specific crime charged (Traverse at 8-10), Juan H. is
6  distinguishable in this context.  In Juan H., the appellate court
7  concluded that by giving a false alibi to the police regarding where he
8  was when his brother shot and killed a gang member[13], Juan H. exhibited
9  a consciousness of guilt of the crime charged (aiding and abetting a
10  first degree murder and attempted murder).  Juan H., 408 F.3d at 1268-
11  69.  The Ninth Circuit disagreed, holding that it was "bare conjecture"
12  to infer from this the specific intent to commit the target offense.
13  Id. at 1276-77.  The court reasoned that Juan H. may have made false
14  statements for any number of reasons - particularly since any statements
15  Juan H. made would likely be used to prosecute his older brother.  Id.
16  at 1277.  Under the instant facts, on the other hand, there are not a
17  multitude of reasons to explain why Petitioner would have eluded police.
18  He had already been cited for the expired registration and the police
19  had already taken the truck into custody.  While he might have hidden
20  because he lied to the officer about his name, this lie furthered the
21  same intent of evading detection for having unlawfully taken the
22  vehicle.  Indeed, Petitioner hid from police in the waterbed only after
23  having been found *driving* a stolen truck that had already been altered
24  to remove the VIN and change the license plates.  Given that the police
25  impounded the vehicle, it was only a matter of time before they

---

27      [13]    Juan H. told the police he was in his family's trailer when the shooting
28  occurred.  Juan H., 408 F.3d at 1267.  In reality, he had been standing right behind
   his brother.  Id.

26

discovered that it was stolen.  Thus, it is hardly "bare conjecture" to infer that when Petitioner hid from the police *the very next day*, it was because he knew the police had figured out that he had been driving a stolen vehicle with the intent to permanently or temporarily deprive the owner if it.

In sum, viewing the evidence in the light most favorable to the prosecution, the Court finds that a rational trier of fact could have found beyond a reasonable doubt that Petitioner had the specific intent to violate California Vehicle Code § 10851.  <u>See</u> <u>Jackson</u>, 443 U.S. at 324; <u>Vasquez-Chan</u>, 978 F.2d at 549.  Accordingly, the Court of Appeal did not unreasonably apply <u>Jackson</u> in upholding Petitioner's convictions.  For this reason, the Court **RECOMMENDS** that Petitioner's first claim for habeas relief be **DENIED**.

### c.   Overt Acts in Furtherance of the Conspiracy and the Timing Thereof (claim three)

In his petition, Petitioner styles this claim as a violation of his due process rights under the Fourteenth Amendment of the United States Constitution.  Pet. at 8-8a, App. B at 6.  He argues that all but one of his convictions under California Vehicle Code § 10851 should be reversed because these vehicle takings occurred prior to the first overt act proven.  Pet. at 6; App. B at 6.  In other words, Petitioner argues that because the only basis for these vehicle taking convictions was a vicarious liability theory based on his alleged participation in the conspiracy, and because he cannot be shown to have been a conspirator until the date of the first overt act, he cannot be held liable for vehicle takings that occurred prior to the first overt act found by the jury.  <u>Id.</u>  In his traverse, Petitioner asserts that this claim is essentially a sufficiency of the evidence claim under <u>Jackson</u>.  Traverse

03cv2224-BTM (BLM)

1  at 13-15.  Relying again on Goldyn, Petitioner argues that this claim

2  raises a federal issue in that a state court is not free to define an

3  element of the offense out of existence - in this case, the fact that

4  "'the overt act marks the commission of the crime and fastens criminal

5  liability upon the conspirators.'"  Id. at 14-15 (quoting People v.

6  Crosby, 58 Cal. 2d 713, 728 (1962)).  Contrary to Respondent's argument

7  (see below), Petitioner notes that his petition for review to the

8  California Supreme Court did, in fact, make clear the federal nature of

9  his claim.  Id. at 14.  Additionally, Petitioner submits that the

10 federal and state standards of review for sufficiency of the evidence

11 are identical (comparing Jackson with People v. Berryman, 6 Cal. 4th

12 1048, 1083 (1993)), and accordingly, argues that the claim is exhausted.

13 Id.

14     Respondent contends that this claim is unexhausted because

15 Petitioner did not allege a due process violation or cite to federal law

16 on appeal or in his petition for review to the California Supreme Court.

17 Answer at 16.  Moreover, Respondent argues that Petitioner's attempt to

18 convert what is essentially a state law issue into a federal claim in

19 his habeas petition before this Court, by appending  a "due process"

20 violation to his claim, fails.[14]  Id.

21     At issue is whether Petitioner's due process claim before this

22 Court truly states a federal claim, such that it is cognizable on habeas

23 review.   Federal habeas corpus relief is not available to correct

24 alleged errors in a state court's application or interpretation of state

25 law.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Lewis v.

26

-------

27     [14]    Because Petitioner's sufficiency of the evidence argument under Goldyn was

28 presented in his traverse, Respondent has not had the opportunity to respond to this
   clarification of Petitioner's claim.

03cv2224-BTM (BLM)

1   <u>Jeffers</u>, 497 U.S. 764, 783 (1990); <u>see</u> <u>also</u> 28 U.S.C. §§ 2254(a),

2   (b)(2).  Here, as in his petition for review to the California Supreme

3   Court, Petitioner expressly asserts a due process claim under the

4   Fourteenth Amendment to the Federal Constitution in his claim heading

5   but does not otherwise reference any federal due process standards.  <u>See</u>

6   Pet. at 8.  To the contrary, the thrust of his argument disputes the

7   appellate court's interpretation of state law.  Indeed, Petitioner

8   concludes:

9           Here, the jury found the earliest overt act of the
            alleged conspiracy was committed on November 14, 1996.  (C.T.
10          299; R.T. 1468-1469.)  Accordingly, as a matter of law, no
            conspiracy existed prior to that date, and Bowman's
11          convictions based on conspiracy theory for vehicle takings
            which took place before the overt acts cannot stand.  (See,
12          <u>People</u> v. <u>Brown</u>, <u>supra</u>, 226 Cal. App. 3d 1362, 1369.)

13  Pet., App. B at 6.  This argument appears to find fault only with how

14  the state court resolved any perceived ambiguity in state law.

15      In his traverse, Petitioner appears to argue that the Court of

16  Appeal unreasonably applied clearly-established Supreme Court law –

17  namely, the <u>Jackson</u> standard.  Traverse at 14-15.  He elaborates that

18  insufficient evidence supports Petitioner's conviction because the Court

19  of Appeal "ignored entirely the fact 'the overt act marks the commission

20  of the crime and fastens criminal liability upon the conspirators.'"

21  Traverse at 15 (quoting <u>Crosby</u>, 58 Cal. 2d at 728).  In other words,

22  Petitioner contends that the appellate court ignored the *fact* that there

23  was no conspiracy at the time that all but one of the unlawful vehicle

24  takings occurred.  Because the existence of a conspiracy is an "element"

25  of any substantive crime for which a defendant is found vicariously

26  liable by virtue of being a member of the conspiracy, Petitioner

27  contends that a conviction for such a crime must be supported by

28  sufficient evidence that a fully-formed conspiracy existed.  <u>See</u> <u>id.</u>

1 (citing Goldyn, 444 F.3d at 1070).  Here, Petitioner argues that all but
2 one of his unlawful driving or taking of vehicles convictions were not
3 so supported because they occurred before a legal conspiracy existed.[15]
4 Id.  However, this issue also appears to turn on the Court of Appeal's
5 interpretation of state statute - specifically, whether under California
6 conspiracy law, every element necessary to obtain a conspiracy
7 conviction must be proven *before* vicarious liability for underlying
8 offenses (i.e. the target crimes of the conspiracy) attaches.  In other
9 words, the "fact" Petitioner challenges is actually the Court of
10 Appeal's *legal conclusion* as to this issue of statutory interpretation.
11 Because habeas relief is unavailable for errors of state law, this claim
12 is not cognizable on habeas review.    Estelle, 502 U.S. at 67-68.

13      The Court also rejects Petitioner's argument that the Court of
14 Appeal did not actually address this claim on the merits (i.e. that it
15 did not respond to the question posed above and, instead, addressed a
16 tangentially-related issue) and that, therefore, this Court should
17 review the issue *de novo*.  Contrary to Petitioner's assertion, the Court
18 of Appeal did address his claim on the merits, finding:

19          Because the earliest alleged overt act found true by the
20     jury occurred on November 14, 1996, Bowman contends all but
       one of his convictions for unlawfully driving or taking
       vehicles stolen before that date must be reversed.  The
21     contention is without merit.

22          Proof of an overt act is required to establish a
       conspiracy.  (§ 184.)  "'[A]n overt act is an outward act
23     done in pursuance of the crime and in manifestation of an
       intent or design, looking toward the accomplishment of the
24     crime.' [Citations omitted.]" (*People v. Zamora* (1976) 18
       Cal.3d 538, 549, fn. 8.)  "In this country, evil thoughts
25     alone cannot constitute a criminal offense; unless and until
       something objective is done toward the effectuation of the
26

27      [15]   Presumably, Petitioner is referring to the subset of convictions for
28 violating California Penal Code § 10851 that the Court of Appeal affirmed (the court
reversed four convictions and vacated the associated sentences).

30

03cv2224-BTM (BLM)

illegal plan, no prosecution is justified; if there is no overt or open act there can be no conviction, and the overt act must be such as furthers the object of the conspiracy." (*People v. Olson* (1965) 232 Cal.App.2d 480, 489-490.)  The purpose of the overt act in a conspiracy prosecution is simply to show that the conspiracy is at work and is neither a plan still resting solely in the minds of the conspirators nor a completed operation no in longer existence.  (*Yates v. United States* (1957) 354 U.S. 298, 334.)[16]

Implicit in Bowman's argument is the premise that the date of the alleged overt act marked the beginning of the conspiracy.  Not so.  While the prosecution must allege and prove an overt act to establish the crime of conspiracy, it is not limited as to which overt acts to allege and prove.  The date of the alleged overt act does not necessarily mark the beginning of the conspiracy and the prosecution need not allege the earliest action by a conspirator toward pursuing the object of the conspiracy as the overt act.

The overt act may be the substantive offense underlying the conspiracy or virtually any act done to effect the object of the conspiracy so long as the agreement has been established but the object of the conspiracy has not been consummated.   (2 LaFave & Scott, Substantive Criminal Law (1986) ch. 6.5, p. 95.)  It is only necessary to prove one overt act.  (*People v. Olson, supra*, 232 Cal.App.2d at p. 489.)[17]

Bowman's reliance on cases such as *People v. Marks* (1988) 45 Cal.3d 1335; *People v. Brown* (1991) 226 Cal.App.3d 1361; and *People v. Tatman* (1993) 20 Cal.App.4th 1 is misplaced.  In those cases, at issue was whether the *conviction of conspiracy* could be upheld when the overt act occurred after the object of the conspiracy had been accomplished.  Here, Bowman is urging reversal of Vehicle Code section 10851 convictions -- not his conspiracy

[16]     The requirement of an overt act also provides a *locus poenitentiae* or an opportunity for the conspirator to reconsider, terminate the agreement and thereby avoid punishment for the conspiracy.  (*United States v. Britton* (1883) 108 U.S. 199, 204-205.)

[17]     In addition to the requisite foundational purpose in establishing the crime of conspiracy, the overt act has other significant aspects, including marking the start of the statute of limitations for the conspiracy charge, which may explain why a particular overt act is alleged.  Under conspiracy law, the statute of limitations does not commence to run at the time of the agreement, but from the time the last overt act was committed in furtherance of the conspiracy.  (*People v. Zamora, supra,* 18 Cal.3d at p. 548.)

conviction -- on the basis of the date of the act.
Lodgment 1 at 18-20.  In sum, applying California law, the Court of Appeal concluded that vicarious liability for underlying offenses (i.e. the target crimes of the conspiracy) attaches even if the "overt act" necessary to actually convict the defendant for the crime of conspiracy has not yet occurred.  Lodgment 1 at 18-20.  While Petitioner may not agree with this conclusion, this Court does not have authority on habeas review to evaluate a state court's interpretation of state law.  See Bradshaw v. Richey, 546 U.S. 74, __, 126 S.Ct. 602, 604 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus"); Estelle, 502 U.S. at 67-68; Lewis, 497 U.S. at 783; see also 28 U.S.C. §§ 2254(a), (b)(2).

Furthermore, even if the Court considered this claim on the merits, the Court of Appeal's decision was not contrary to, or an unreasonable application of, clearly established federal law.  28 U.S.C. 2254(d)(1). Petitioner, who is represented by counsel, has not cited any clearly established federal law holding that a conspiracy does not commence until the first charged and proven overt act is committed.  Moreover, the clearly established law provides that a "conspirator is liable for all foreseeable substantive offenses committed in furtherance of the conspiracy."  United States v. Matta-Ballesteros, 71 F.3d 754, 765 (9th Cir. 1996) (citing Pinkerton v. United States, 328 U.S. 640, 646-47 (1946)).  While it is true that a "defendant cannot be held liable for substantive offenses committed before joining or after withdrawing from a conspiracy," (U.S. v. Lothian, 976 F.2d 1257, 1261-1262 (9th Cir. 1992)), the appellate court reversed Petitioner's convictions for substantive crimes that occurred prior to his joining the conspiracy:

32

1  Bowman correctly argues that reversal is mandated for his
   Vehicle Code section 10851 convictions for vehicles stolen
2  prior to his joining the conspiracy. A conspirator cannot be
   held liable for a substantive offense committed pursuant to
3  the conspiracy if the offense was committed *before* the
   conspirator joined the conspiracy. (*People v. Weiss* (1958)
4  50 Cal.2d 535, 563-566.) Here, there was no evidence linking
   Bowman to the criminal operation on Richland Road before
5  August 1996 and therefore no evidence he was a member of the
   conspiracy before then. To assume, on this record, that
6  Bowman had joined the conspiracy before then would be
   engaging in conjecture. . . . Accordingly, we reverse
7  Bowman's convictions on counts 5 (vehicle stolen 3/31/96), 8
   (vehicle stolen 4/18/96), 14 (vehicle stolen 7/23/96), and 32
8  (vehicle stolen 7/22/96).

9  Lodgment 1 at 15-16. The facts set forth in the Factual Background

10 section of this report and recommendation and in the appellate court's

11 opinion support the court's factual determination that Petitioner joined

12 the conspiracy in August 1996. Accordingly, the Court of Appeal's

13 determination was neither contrary to nor an unreasonable application

14 of clearly established federal law and it's factual determination was

15 not objectively unreasonable in light of the evidence presented at

16 trial.

17 For all of these reasons, the Court **RECOMMENDS** that Petitioner's

18 third claim for habeas relief be **DENIED**.

19 **2.   Sufficiency of the Evidence in Support of Armed
       Enhancements (claim five)**
20

21 Petitioner claims that insufficient evidence supports the

22 enhancements to his sentence for being armed during the commission of

23 the conspiracy and the chop shop offense. Traverse at 17-20. Though

24 Respondent questions whether Petitioner properly raised or exhausted the

25 federal aspect of this claim, Respondent expressly waives exhaustion of

26 the federal claim for sufficiency of the evidence under <u>Jackson</u>. Answer

27 at 18. For purposes of habeas review, because the California Supreme

28 Court summarily denied Petitioner's petition for review on direct appeal

1  (Suppl. Lodgment 7), this Court must look through to the last reasoned
2  state court decision.  See Ylst, 501 U.S. at 801-06.  Here, the last
3  reasoned state court decision came from the California Court of Appeal,
4  which found sufficient evidence to support the jury's finding that
5  Petitioner was armed during the commission of the conspiracy and the
6  chop shop offense.  Lodgment 1.

7       California Penal Code § 12022(a)(1) provides that "any person who
8  is armed with a firearm in the commission of a felony or attempted
9  felony shall be punished by an additional and consecutive term of
10  imprisonment in the state prison for one year, unless the arming is an
11  element of that offense."  Cal. Penal Code § 12022(a)(1).  For an armed
12  enhancement to apply, the defendant must knowingly carry a firearm or
13  have it available for use, either offensively or defensively.  People
14  v. Bland, 10 Cal. 4th 991, 997 (1995).  By requiring that the defendant
15  be armed "in the commission" of the felony, "section 12022 implicitly
16  requires both that the 'arming' take place during the underlying crime
17  and that it have some 'facilitative nexus' to that offense."  Id. at
18  1002.

19       In addressing this claim, Petitioner contends that the Court of
20  Appeal unreasonably found sufficient evidence of both the knowledge and
21  "facilitative nexus" requirements.  Traverse at 17-20.  The Court of
22  Appeal reasoned that:

23       A defendant is "armed" under section 12022, subdivision (a)
         "if the defendant has the specified weapon available for use,
24       either offensively or defensively. [Citations.]" (People v.
         Bland (1995) 10 Cal.4th 991, 997.)  There must be a
25       "'facilitative nexus'" or link between the substantive
         offense and the firearm. (Id. at p. 1002.)  In Bland, our
26       Supreme Court addressed the question of when a defendant must
         be armed for purposes of a drug possession offense: "[d]rug
27       possession is ... a 'continuing' offense, one that extends
         through time.  Thus, throughout the entire time the defendant
28       asserts dominion and control over illegal drugs, the
         defendant is criminally liable for the drug possession.

34

[Citations.] *And when, at any time during the commission of the felony drug possession, the defendant can resort to a firearm to further that offense, the defendant satisfies the statutory language of being 'armed with a firearm in the commission ... of a felony.'* ([Penal Code] § 12022, subd. (a).)" (*Id.* at p. 999, italics added.)

An auto theft ring is "truly a 'continuing conspiracy ....'" (*People v. Zamora, supra*, 18 Cal. 3d at p. 560, fn. 21, original italics [referring to term as used in *United States v. Kissel* (1910) 218 U.S. 601].) The conspiracy count and operation of a chop shop count here were continuing offenses, and the *Bland* rule applies.

Here, the firearms were available for use at any time during the continuing offenses. The logical nexus between the firearms and the chop shop was the desire to protect the stolen vehicles and the chop shop operation and to avoid arrest.

Lodgment 1 at 22-3. Again, on habeas review, this Court must view the evidence in the light most favorable to the prosecution and provide relief only if the appellate court unreasonably applied the <u>Jackson</u> standard in determining that "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." <u>Juan H.</u>, 408 F.3d at 1274; <u>Jackson</u>, 443 U.S. at 324.

Petitioner argues that it was unreasonable to infer that he knew the weapons were available for use because he was asleep on the sofa and the only loaded weapon was hidden in a different sofa. Traverse at 18. This case is analogous to <u>People v. Martinez</u>, which the California Supreme Court cited with approval in <u>Bland</u>. <u>Bland</u>, 10 Cal. 4th at 997-98 (citing <u>People v. Martinez</u>, 150 Cal. App. 3d 579, 605 (1984)). In <u>Martinez</u>, the defendant's crime partner took a screwdriver with him when he raped the victim and then left it at the foot of the bed when he was done and left the room. <u>Martinez</u>, 150 Cal. App. 3d at 605 <u>overruled on other grounds by</u>, <u>People v. Hayes</u>, 52 Cal. 3d 577, 628 (1990). Martinez then took his turn to rape the victim. <u>Id.</u> When he was through, the victim noticed the screwdriver and covered it with a sheet. <u>Id.</u> In

1  rejecting Martinez's argument that insufficient evidence supported a
2  finding that Martinez was armed with a deadly weapon (the screwdriver)
3  during the rape, the appellate court concluded: "[i]f the screwdriver
4  had been visible to [the victim] during the rapes, it was not
5  unreasonable for the jury to conclude that it had also been visible to
6  Martinez and that he had recognized it as being within his reach-i.e.,
7  'available' to him." Bland, 10 Cal. 4th at 997-98 (citing Martinez, 150
8  Cal. App. 3d at 605).  In the instant case, testimony by Investigator
9  Murillo shows that, though the .12-gauge shotgun in the couch was
10  partially covered by a gun sock, "the actual mechanisms that you load
11  a round in was visible." Suppl. Lodgment 2, vol. 4 at 474-75.  When he
12  saw this "couple of inches" of the shotgun, he had no trouble
13  recognizing it as a weapon.  Id. at 475.  Thus, a reasonable trier of
14  fact could infer that Petitioner knew there was a firearm in the shed.[18]
15  Moreover, Investigator Murillo testified that Petitioner was only "a
16  couple of steps" from the shotgun.  Suppl. Lodgment 2, vol. 4 at 476.
17  As such, it was "available for use." See Bland, 10 Cal. 4th at 997;
18  Martinez, 150 Cal. App. 3d at 605.

19       In regard to the "facilitative nexus" requirement, Petitioner
20  argues the Court of Appeal upheld Petitioner's conviction based on pure
21  speculation that the firearms would be used to protect the stolen

---

23      [18]  It would be reasonable to infer that Petitioner also knew the shotgun was
24  loaded - or at least that ammunition was available and ready for use - because officers
    found large amounts of ammunition scattered throughout the shed.  Suppl. Lodgment 2,
25  vol. 4 at 524-25, vol. 5 at 570, 573-74, 600, 625).  In regard to the specific,
26  functional weapon at hand, eight loose .12-gauge shotgun shells were found in a vinyl
    zip pouch on a shelf on the wall of the shed (suppl. lodgment 2, vol. 4 at 526-28),
27  nine .12-gauge shotgun shells were in a white box on the windowsill (suppl. lodgment
28  2, vol. 5 at 570, 625), and one .12-gauge shotgun shell was found in a cabinet (suppl.
    lodgment 2, vol. 5 at 574).

vehicles and the chop shop operation. Traverse at 18. Petitioner relies on United States v. Rios, 449 F.3d 1009 (9th Cir. 2006), where the Ninth Circuit emphasized that "[n]o court of appeals has held that even close proximity between a firearm and a collateral product of a drug trafficking crime, such as prescription drug paperwork, satisfies the requisite nexus." Id. (quoting Rios, 449 F.3d at 1015). This case is distinguishable for two reasons. First, the shotgun was not simply near "a collateral product" of the conspiracy to unlawfully take vehicles or the chop shop operation. To the contrary, the shotgun and Petitioner were found on the grounds where the stolen cars were kept and on which the chop shop operated. More specifically, they both were found in the shed, which contained many of the tools of the trade for a chop shop operation - license plates, die stamping equipment used to imprint VIN numbers, registration tabs, vehicle repair manuals, a keyring full of keys, and Ford logos. Lodgment 1 at 6. Second, in Rios, the Ninth Circuit added that the inference that a functional nexus existed was made all the weaker by the fact that the gun was unloaded and no ammunition was found in the apartment. Rios, 449 F.3d at 1015-16. The opposite is true here - the .12-gauge shotgun was loaded and appropriate ammunition was scattered throughout the shed. This, therefore, strengthens the inference that the shotgun was possessed to protect the conspiracy and chop shop operation. As such, this Court rejects Petitioner argument that the Court of Appeal's decision was based upon conjecture or speculation.

For the foregoing reasons, this Court finds that, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found proof of guilt beyond a reasonable doubt. Jackson, 443 U.S. at 324. The Court of Appeal did not unreasonably

1  apply clearly established Supreme Court precedent in upholding
2  Petitioner's conviction. 28 U.S.C. § 2254(d). Accordingly, this Court
3  **RECOMMENDS** that Petitioner's fifth claim for relief be **DENIED**.

4          **3.  Sufficiency of the Evidence Supporting Conviction for
                Being a Felon in Possession of a Firearm (claim four)**
5

6          Petitioner claims that insufficient evidence supports his
7  conviction for being a felon in possession of a firearm. Traverse at
8  16-17. As with claim five, Respondent questions whether Petitioner
9  properly raised or exhausted the federal aspect of this claim, but
10 expressly waives exhaustion of the federal claim for sufficiency of the
11 evidence under <u>Jackson</u>. Answer at 18. Accordingly, this Court begins
12 its review by looking through to the last reasoned state court decision,
13 which came from the California Court of Appeal.

14         The Court of Appeal set forth the law pertaining to this offense
15 as follows:

16             The elements of the offense are conviction of a felony
17         and ownership, possession, custody or control of a firearm.
           (*People v. Bray* (1975) 52 Cal.App.3d 494, 497.) Knowledge of
           possession or custody is also an element of the offense.
18         (*People v. Snyder* (1982) 32 Cal.3d 590, 592.)

19             Possession may be actual or constructive possession.
20         (*People v. White* (1958) 50 Cal.2d 428, 431.)  "The accused
           has constructive possession when he maintains control or a
21         right to control the contraband. Possession may be imputed
           when the contraband is found in a location which is
22         immediately and exclusively accessible to the accused and
           subject to his dominion and control." (*People v. Showers*
23         (1968) 68 Cal.2d 639, 643-644.)

24 Lodgment 1 at 21. Petitioner does not dispute that he is a convicted
25 felon. It is further undisputed that Petitioner did not have actual
26 possession of either the .12-gauge shotgun or the .22 caliber rifle.
27 For the reasons stated in section 2 of this report and recommendation
28 (in regard to claim five), this Court finds that the appellate court did

1  not err in finding that a rational trier of fact could have found that

2  Petitioner had knowledge of the weapons.  Therefore, the only remaining

3  issue Petitioner challenges is the appellate court's finding that he had

4  constructive possession, custody or control of the firearms.  Traverse

5  at 16-17.  More specifically, Petitioner argues that the weapons were

6  not *exclusively* accessible to him.  Id. at 17.

7       In concluding that sufficient evidence supported Petitioner's

8  conviction, the Court of Appeal found as follows:

9          The jury reasonably could infer Bowman knew that his
           friend Grubaugh kept the firearms in the shed or had seen the
10         firearms in there previously.  Access was not restricted to
           the shed, where various tools, equipment and supplies for the
11         chop shop operation were kept, and Bowman worked on the
           Richland Road property for three months before his arrest.
12
           The .12-gauge shotgun was a couple of steps away from
13         Bowman.  The .22 caliber rifle was three steps from the
           shotgun and two steps behind Bowman.  This constituted
14         substantial evidence the firearms were immediately and
           exclusively accessible to Bowman and subject to his dominion
15         and control.

16  Lodgment 1 at 22.

17      The appellate court's opinion in this case presents an unusual

18  problem.  By relying on narcotics cases to define "possession," the

19  Court of Appeal appears to have added an element to this crime that is

20  not included in California Penal Code § 12021 - namely, *exclusive*

21  possession.  California courts have defined this crime as follows:

22         The elements of the offense proscribed by section 12021 are
           conviction of a felony and ownership, possession, custody or
23         control of a firearm.  Knowledge is also an element of the
           offense.
24

25  People v. Jeffers, 41 Cal. App. 4th 917, 922 (5th Dist. 1996); People

26  v. Snyder, 32 Cal. 3d 590, 592 (1982) (same with added element of

27  firearm capable of being concealed on person for a related offense

28  defined in section 12021).  "[I]t is a relatively simple crime to commit

39

1   ... [i]mplicitly, the crime is committed the instant the felon in any
2   way has a firearm within his control." People v. Ratcliff, 223 Cal.
3   App. 3d 1401, 1410 (4th Dist. 1990). "'Possession of (a gun) may be
4   proved circumstantially and it is not necessary to show that the accused
5   was in exclusive possession of the premises.'" People v. Neese, 272
6   Cal. App. 2d 235, 245 (2nd Dist. 1969) (also applying section 12021).

7         In the instant case, Petitioner's jury was not told that Petitioner
8   had to have exclusive possession of the firearm.  Rather, in accordance
9   with applicable law and CALJIC 12.44, the jury was instructed:

10        The law recognizes two kinds of possession, what we refer to
          as actual possession and constructive possession.  Actual
11        possession requires that a person exercise direct physical
          control over a thing.  Constructive possession does not
12        require actual possession but does require that a person
          knowingly exercise control or the right to control a thing in
13        question, in this case the firearm, either directly or
          through another person or persons.  The law recognizes that
14        one person may have possession alone or two or more persons
          together may share actual or constructive possession.
15

16   Lodgment 2, vol. 10 at 1233.

17         Applying this law, it was entirely reasonable for a rational trier
18   of fact to conclude that Petitioner had the .12-gauge shotgun that was
19   a couple of steps away from him and the rifle that was right behind him
20   within his custody and control - particularly given that he was alone
21   in the shed with the door closed.  Even if the appellate court erred in
22   its reasoning, its final decision was appropriate.  "[I]t is the state
23   court's decision, as opposed to its reasoning, that is judged under the
24   'unreasonable application' standard." Merced v. McGrath, 426 F.3d 1076,
25   1081 (9th Cir. 2005).  The Court of Appeal concluded that sufficient
26   evidence supported Petitioner's conviction for being a felon in
27   possession even under the higher standard of exclusive possession.
28   While this Court finds that the Court of Appeal added an element to the

1  charged and proven crime, this Court agrees with its ultimate conclusion
2  that Petitioner's felon in possession conviction is supported by
3  substantial evidence in the record. Accordingly, this Court finds that
4  the appellate court's decision was not contrary to nor an unreasonable
5  application of clearly established federal law and **RECOMMENDS** that
6  Petitioner's fourth claim for relief be **DENIED**.

7            **B.    Due Process Claim (claim two)**

8       Petitioner asserts a due process challenge to his convictions for
9  the chop shop operation and the thirteen counts of tampering with VINs
10 on the grounds that they may have been based on a legally deficient
11 theory. Pet. at 7-7a, App. B at 4-5; Traverse at 10-13. Specifically,
12 Petitioner argues that because the requisite intent for Vehicle Code §
13 10851 is phrased in the alternative (i.e. intent to either temporarily
14 or permanently deprive the owner of title and possession), the jury
15 could have convicted Petitioner of conspiracy to violate § 10851 based
16 on a temporary deprivation theory, i.e. a theory of joyriding. Id. The
17 jury was instructed on the theory that a conspirator may be vicariously
18 liable for acts or crimes that are the "natural and probable
19 consequences of any crime [or] act of a coconspirator to further the
20 object of the conspiracy, even though that crime [or] act was not
21 intended as a part of the agreed upon objective and even though [the
22 defendant] was not present at the time of the commission of that crime
23 [or] act." Traverse at 10-11 (citing Suppl. Lodgment 5 at 16 n.6).
24 Petitioner contends that operating a chop shop and tampering with VINs
25 are not the natural and probable consequences of a joyriding conspiracy
26 and, because it is unclear whether the jury convicted Petitioner based
27 upon a theory of temporary *or* permanent deprivation, reversal is
28 required. Id. at 10-13. In regard to the appellate court's rejection

41

1  of this argument, Petitioner argues that it was objectively unreasonable
2  for the appellate court to conclude that it was "absolutely certain"
3  that the jury did not rely upon the temporary deprivation theory.   Id.
4  at 12-13.

5       Respondent counters that Petitioner has failed to raise or exhaust
6  a federal claim.   Answer at 13-15.   More precisely, Respondent argues
7  that "Petitioner merely assails the California Court of Appeal's
8  interpretation of California Vehicle Code section 10851(a), as applied
9  to the facts of this case, as providing a legitimate basis for finding
10 the chop shop and VIN tampering convictions based on California's
11 'natural and probable consequences' doctrine of conspirator liability."
12 Id. at 15.   Appending an allegation that his due process rights were
13 violated does not, according to Respondent, alter the fact that
14 Petitioner's claim fundamentally alleges only an error in the
15 application of state law.   Id.

16      Petitioner asserts that this claim is exhausted because Petitioner
17 cited the relevant California cases in his petition for review and these
18 cases apply the same standard as the federal cases.   Traverse at 11.
19 In considering the issue of whether relying on a state legal standard
20 that is similar to the federal standard exhausts a claim, the Supreme
21 Court made clear that "mere similarity of claims is insufficient to
22 exhaust."   Duncan v. Henry, 513 U.S. 364, 366 (1995).   However, it left
23 open the question of whether a claim is exhausted when the state and
24 federal standards are not merely similar, but are instead identical or
25 functionally identical.   Peterson v. Lampert, 319 F.3d 1153, 1161 (9th
26 Cir. 2003).   The Ninth Circuit has concluded that a claim is fairly
27 presented for exhaustion purposes when the state and federal standards
28 are identical.   Sanders v. Ryder, 342 F.3d 991, 1000-1001 (9th Cir.

03cv2224-BTM (BLM)

1  2003).  Here, because Petitioner expressly claimed that his due process

2  rights under the Fourteenth Amendment of the United States Constitution

3  were violated in his petition for review to the California Supreme Court

4  (Insyxiengmay v. Morgan, 403 F.3d 657, 668 (9th Cir. 2005)) and relied

5  on a California standard that is functionally identical to the federal

6  standard[19] (Sanders, 342 F.3d at 1000-1001), the Court finds that

7  Petitioner has raised and exhausted a federal claim.

8       In the same vein, contrary to Respondent's assertion (Answer at 13-

9  15), the Court of Appeal's decision did not turn solely on its

10 interpretation of a state statute (such that it would not be cognizable

11 on federal habeas review).  Instead, the decision focused on whether,

12 under the facts of this case, it was clear that the jury's determination

13 did not rest on a temporary deprivation theory.  As Petitioner points

14 out, "it has long been settled that when a case is submitted to the jury

15 on alternative theories the unconstitutionality of any of the theories

16 requires that the conviction be set aside."  Lara v. Ryan, 455 F.3d

17 1080, 1085 (9th Cir. 2006) (quoting Sandstrom v. Montana, 442 U.S. 510,

18 526 (1979)).  Stated differently, "the proper rule to be applied is that

19 which requires a verdict to be set aside in cases where the verdict is

20 supportable on one ground, but not on another, and it is impossible to

21 tell which ground the jury selected."  Yates v. United States, 354 U.S.

22 298, 312 (1957) overruled on other grounds by, Burks v. United States,

23 437 U.S. 1, 98 (1978).  The exception to this rule is that "reversal may

24 not be required if '[the court] is absolutely certain' that the jury

25 relied upon the legally correct theory to convict the defendant."  Lara,

26

27     [19]   Compare Sandstrom v. Montana, 442 U.S. 510, 526 (1979) and Lara v. Ryan,

28 455 F.3d 1080, 1085 (9th Cir. 2006) with People v. Green, 27 Cal. 3d 1, 69 (1980),
   abrogated on other grounds by, People v. Martinez, 20 Cal. 4th 225 (1999).

1 │ 455 F.3d at 1085 (quoting <u>Keating v. Hood</u>, 191 F.3d 1053, 1063 (9th Cir.

2 │ 1999)).

3 │ In this case, Petitioner contends that the Court of Appeal's

4 │ application of the "absolutely certain" standard was objectively

5 │ unreasonable. Traverse at 12. The Court of Appeal found as follows:

> As to the possibility the conspiracy conviction was based on a joyriding theory, neither party in this case propounded a theory of joyriding in this case. Moreover, under the evidence presented in this case, no reasonable trier of fact possibly could have found the vehicles here were taken merely for joy rides. (See *People v. Guertin* (1996) 47 Cal.App.4th 505, 507-508.) "Given the length of time appellant kept the car, and its condition when recovered, no reasonable trier of fact could have found appellant was only joyriding." (*Id.* at p. 508.) The cars stolen by the conspirators here either had their identification altered or were used as donor vehicles. The conspirators were never going to return the vehicles to the owners.
>
> Notwithstanding the wording of Vehicle Code section 10851 (see also CALJIC 14.36), the conspiracy conviction was not based on a joyriding theory. Thus, it simply does not matter that operating a chop shop and tampering with a VIN number are not natural and probable consequences of a joyriding conspiracy. Accordingly, the *Green* rule does not apply; we know that the jury did *not* improperly apply the doctrine of natural and probable consequences in convicting Bowman of operating a chop shop and tampering with VIN numbers.

19 │ Lodgment 1 at 17-18. On habeas review, this Court may grant relief only

20 │ if the Court of Appeal's decision was contrary to, or an unreasonable

21 │ application of, clearly established federal law. 28 U.S.C. 2254(d)(1).

22 │ A review of the evidence in this case supports the Court of

23 │ Appeal's conclusion that it was absolutely certain the jurors did not

24 │ rely on a temporary deprivation, or joyriding, theory. First, as

25 │ previously discussed, the vehicles stolen by the conspirators and stored

26 │ on the Richland Road property were all in various stages of

27 │ transformation in order to conceal their identity - VINs were either

28 │ removed or switched and various structural changes had been made such

1   as painting, removing side rails (from the tow truck), adding tape,

2   covering ownership logos, and removing or replacing grills and fenders.

3   These kinds of significant changes are completely inconsistent with a

4   joyriding theory.  Second, while Petitioner argues that the evidence

5   that he drove a vehicle (the incident where he was stopped by police)

6   demonstrated conduct consistent with temporary use (Traverse at 12 n.3),

7   the Court disagrees.  The Ford truck Petitioner drove had *already* had

8   its VIN and federal label removed and displayed license plates that did

9   not belong to the vehicle.  Lodgment 1 at 4.  This demonstrates that the

10   truck had been in Petitioner's possession for a significant period of

11   time (i.e. enough time to make these changes) and that Petitioner

12   intended to do more than just temporarily deprive the owner of title or

13   possession of the vehicle (he damaged the vehicle, thereby significantly

14   decreasing its value).  Finally, some of the stolen vehicles had been

15   missing for a month or more before they were recovered from the Richland

16   Road property in mid-November 1996.  Lodgment 1 at 7-8.  This, again,

17   is inconsistent with a temporary deprivation theory.  Therefore, the

18   Court concludes that the Court of Appeal's application of the

19   "absolutely certain" standard as described by the Supreme Court in

20   Sandstrom was not objectively unreasonable.  28 U.S.C. § 2254(d);

21   Lockyer, 538 U.S. at 75-76.  Because the Court of Appeal's decision was

22   not contrary to, or an unreasonable application of, clearly established

23   federal law, this Court **RECOMMENDS** that Petitioner's second claim for

24   relief be **DENIED**.

25      C.   **Sentencing Issues (claims six, seven and eight)**

26      Petitioner challenges his sentence of 302 years-to-life on several

27   grounds.  First, he argues that the state courts improperly applied

28   California Penal Code § 654 in sentencing Petitioner for each individual

vehicle taking and for possession of a firearm by a felon instead of staying those convictions and sentencing him based on the conspiracy and chop shop counts (claim six). Pet. at 11-11a, App. B at 11. Second, Petitioner contends the state courts improperly applied the "Three Strikes" law in sentencing Petitioner consecutively instead of concurrently for all of the vehicle taking counts and the firearm possession count (claim seven). Pet. at 12-12a, App. B at 12-13. Finally, Petitioner raises an Eighth Amendment challenge to his "Three Strikes" sentence - a sentence he contends is the functional equivalent of a life sentence without the possibility of parole for theft-related crimes (claim eight). Pet. at 13-13a, App. B at 14-15; Traverse at 20-27. Respondent contends that claims six and seven do not raise federal claims because they refers solely to the application of state sentencing statutes. Answer at 20. As to Petitioner's Eighth Amendment claim, Respondent essentially argues that because Petitioner's convictions and prior strikes involved much more serious offenses than those in Lockyer v. Andrade, 538 U.S. 63 (2003) - Andrade's sentence having been upheld following an Eighth Amendment challenge - the Court of Appeal's conclusion that Petitioner's sentence does not violate the Eighth Amendment was neither contrary to, nor an unreasonable application of, Supreme Court law. Id. at 24-29.

Petitioner was sentenced under California's "Three Strikes" law, which provides for increased sentences for those individuals found to be habitual criminals. Specifically, the sentence for each of his individual convictions was increased to a term of twenty-five years to life, pursuant to California Penal Code § 667(e)(2)(A). See Suppl. Lodgment 1, vol. 1 at 168-75; Suppl. Lodgment 2, vol. 14 at 38-39. The trial court imposed consecutive sentences for each of the fourteen

46

1   counts of unlawfully driving or taking a vehicle, the receipt of stolen

2   property count, and the possession of a firearm by a felon count (see

3   id.), as required by section 667(c), which provides:

4       (c) Notwithstanding any other law, if a defendant has been
        convicted of a felony and it has been pled and proved that

5       the defendant has one or more prior felony convictions as
        defined in subdivision (d), the court shall adhere to each of

6       the following:

7                                   . . .

8           (6) If there is a current conviction for more than
            one felony count not committed on the same

9           occasion, and not arising from the same set of
            operative facts, the court shall sentence the

10          defendant consecutively on each count pursuant to
            subdivision (e).

11

12          (7) If there is a current conviction for more than
            one serious or violent felony as described in

13          paragraph (6), the court shall impose the sentence
            for each conviction consecutive to the sentence for

14          any other conviction for which the defendant may be
            consecutively sentenced in the manner prescribed by

15          law.

16  Cal. Penal Code § 667(c)(6)-(7) (West 2006).  Applying California Penal

17  Code § 654, the trial court stayed Petitioner's convictions for the

18  conspiracy and chop shop counts.  See id.  The version of Section 654

19  in effect at the time of Petitioner's sentencing provided:

20          An act or omission which is made punishable in different
        ways by different provisions of this code may be punished

21      under either of such provisions, but in no case can it be
        punished under more than one; an acquittal or conviction and

22      sentence under either one bars a prosecution for the same act
        or omission under any other.

23

24  Cal. Penal Code § 654 (1977 amendment).  While the legislature amended

25  section 654 on September 15, 1997 (between the trial court's sentencing

26  of Petitioner on April 21, 1997 and the appellate court's subsequent

27  denial of his direct appeal on March 18, 1999) to mandate that a

28  defendant "**shall** be punished under the provision that provides for the

                                    47

1  *longest* potential term of imprisonment," the appellate court correctly
2  concluded that at the time Petitioner was sentenced, the trial court had
3  discretion as to which sentences to impose and which to stay. See
4  Lodgment 1 at 25 citing People v. Norrell, 13 Cal. 4th 1, 8 (1996)
5  ("Under Penal Code section 654, a trial court has discretion to impose
6  a sentence that is commensurate with what it determines on the *facts* to
7  be a defendant's culpability...").

### 1.   Stayed vs. Imposed Sentences (claim six)

9       As previously noted, Petitioner argues that the Court of Appeal
10  erred in upholding his sentence for each vehicle taking count[20] and for
11  possession of a firearm by a felon. Pet., App. B at 11. He emphasizes
12  that each individual vehicle taking and his possession of a firearm were
13  incidental to the primary objectives of operating a chop shop. Id.
14  Under this reasoning, Petitioner argues that California Penal Code § 654
15  bars separate punishment for each vehicle taking and for firearm
16  possession. Id. Though not expressly stated, the logical conclusion
17  of Petitioner's argument is that the trial court should have imposed
18  sentences based upon the conspiracy and/or chop shop convictions instead
19  of the individual vehicle taking and firearm convictions.

20       Federal habeas corpus relief is not available to correct alleged
21  errors in a state court's application or interpretation of state law.
22  See Estelle, 502 U.S. at 67-68; Lewis, 497 U.S. at 783; see also 28
23  U.S.C. §§ 2254(a), (b)(2). Thus, as Respondent correctly notes, to the
24  extent Petitioner claims that the California courts erred in their
25  interpretation or application of Penal Code § 654, he raises an issue
26  of state law which is not cognizable on federal habeas corpus. See

---

28       [20]   Presumably meaning the ten remaining convictions after the Court of Appeal
reversed four of his convictions on direct appeal. See Lodgment 1 at 15-16.

1   <u>Watts v. Bonneville</u>, 879 F.2d 685, 687 (9th Cir. 1989) (holding that an

2   alleged violation of Penal Code § 654 fails to state a basis for federal

3   habeas relief).   As such, this Court is without authority under 28

4   U.S.C. § 2254(a) to review Petitioner's allegations of state law

5   sentencing error.[21]

6         Furthermore, even if this Court were to reach the merits of

7   Petitioner's claim, Petitioner would not be entitled to relief.  As the

8   Court of Appeal correctly concluded, the version of section 654

9   applicable to Petitioner's sentence did not mandate which sentences must

10  be stayed and which may be imposed.   To the contrary, the California

11  Supreme Court had expressly concluded that discretion to make this

12  determination lay with the trial court.  <u>See</u> Lodgment 1 at 25 (citing

13  <u>Norrell</u>, 13 Cal. 4th at 8).   A review of the facts in light of the

14  applicable law does not reveal evidence that the trial court abused its

15  discretion.  Accordingly, this Court **RECOMMENDS** that Petitioner's sixth

16  claim for habeas relief be **DENIED**.

17         **2.   Consecutive vs. Concurrent Sentencing (claim seven)**

18        In his seventh claim for relief, Petitioner asserts that the Court

19  of Appeal erred in upholding the trial court's decision to impose

20

21        [21]   It also does not appear that Petitioner has exhausted this claim.  The

22  exhaustion requirement is satisfied "if the state courts have had the first opportunity

23  to hear the claim sought to be vindicated" in federal habeas proceedings.  <u>Picard</u>, 404

    U.S. at 276.   For exhaustion purposes, a federal claim must have been "fairly

24  presented" to the state courts.  <u>Id.</u> at 275.  "To 'fairly present' [a] federal claim

25  to the state courts, [a petitioner must] alert the state courts to the fact that he

    [is] asserting a claim under the United States Constitution."  <u>Hiivala v. Wood</u>, 195

26  F.3d 1098, 1106 (9th Cir. 1999) (citing <u>Duncan</u>, 513 U.S. at 365-66).  While Petitioner

27  raised the same claim in his petition for review to the California Supreme Court, he

28  did not cite to federal law or assert any constitutional violation.  As such, this

    Court finds that claim six also is unexhausted.

consecutive as opposed to concurrent sentences for each of the vehicle taking offenses.   Pet., App. B at 12-13.   Central to Petitioner's argument is the aspect of California's "Three Strikes" law that vests the trial court with the discretion to impose concurrent sentences where multiple felony convictions "arise from the same set of operative facts." Id. Petitioner contends that all of the vehicle takings arose from the same set of operative facts, to wit, the conspiracy to steal vehicles and run a chop shop operation. Id. As such, the trial court had discretion to impose concurrent sentences and Petitioner contends it abused its discretion by failing to do so. Id.

As with Petitioner's sixth claim, federal habeas corpus relief is unavailable because Petitioner's claim only alleges an error as to the state court's application or interpretation of state law.[22] See Estelle, 502 U.S. at 67-68; Lewis, 497 U.S. at 783. Moreover, as Petitioner concedes and the Court of Appeal correctly pointed out, even if the trial court determined that the convictions arose from the same set of operative facts, it was still within the trial court's discretion whether or not to impose concurrent sentences. See Lodgment 1 at 28 (citing People v. Hendrix, 16 Cal. 4th 508, 511 (1997)). As Petitioner has not set forth facts showing that the trial court abused its discretion, Petitioner would not be entitled to habeas relief even if this Court had authority to consider the claim, which it does not. See 28 U.S.C. § 2254(a).

Accordingly, this Court **RECOMMENDS** that Petitioner's seventh claim for habeas relief be **DENIED**.

---

[22]   For the same reasons as set forth in regard to claim six, this Court finds that claim seven is also unexhausted. See Picard, 404 U.S. at 275-276); Hiivala, 195 F.3d at 1106.

### 3.   Eighth Amendment Claim (claim eight)

As Respondent acknowledges, Petitioner properly raised his Eighth Amendment claim in his petition for review to the California Supreme Court and, thus, exhausted the claim. Because the California Supreme Court summarily denied Petitioner's petition for review on direct appeal (Suppl. Lodgment 7), this Court must look through to the Court of Appeal's decision, as the last reasoned state court decision on this claim. See Ylst, 501 U.S. at 801-06.

In a very thorough analysis of Petitioner's claims in light of applicable federal and state law, the California Court of Appeal rejected Petitioner's arguments:

> Bowman contends his 402-year-to-life sentence violated the prohibitions against cruel and/or unusual punishment of the California and United States Constitutions. As a result of our finding that four of his counts of unlawfully driving or taking a vehicle must be reversed, Bowman's sentence will be reduced to 302 years to life. In either case, the sentence is the functional equivalent of a term of life imprisonment without the possibility of parole.[23]

> Bowman cannot successfully rely on the federal prohibition against cruel and unusual punishment. The United States Supreme Court last addressed the question of whether the Eighth Amendment includes a proportionality guarantee in non-capital cases in *Harmelin v. Michigan* (1991) 501 U.S. 957. While *Harmelin* did not contain a majority opinion with respect to the issue, two Justices concluded the Eighth Amendment contains no proportionality guarantee (*id.* at p. 965 [opn. of Scalia, J.]) and three other justices concluded the amendment forbids only those sentences that are "'grossly disproportionate'" to the crime (*id.* at p. 1001 [opn. of Kennedy, J.]). Even those Justices recognizing a guarantee of proportionality review stressed that, outside the context of capital punishment, successful challenges to particular

---

[23]   We note that the minimum term of Bowman's indeterminate sentence, now 302 years, acts merely as a "gauge of parole eligibility." (*People v. Anderson* (1995) 35 Cal.App.4th 587, 596.) Under section 667, subdivision (c)(5), Bowman cannot receive credits that exceed more than one-fifth of his total term of imprisonment. Therefore, for all practical purposes, Bowman has received the functional equivalent of a life sentence without the possibility of parole.

sentences are "'"exceedingly rare"'" because of the "relative lack of objective standards concerning terms of imprisonment...." (*Ibid.*)

The United States Supreme Court earlier had addressed the constitutionality of a Texas recidivist statute requiring life imprisonment upon conviction of a third felony in *Rummel v. Estelle* (1980) 445 U.S. 263.  Over the course of nine years, Rummel had been convicted of fraudulently using a credit card to obtain $80 worth of goods or services, passing a forged check in the amount of $28.36 and obtaining $120.75 by false pretenses.  (*Id.* at pp. 265-266.)  In response to Rummel's argument that life imprisonment was "grossly disproportionate" to the three felonies he had committed, the high court concluded the mandatory life sentence did not constitute cruel and unusual punishment under the Eighth and Fourteenth Amendments.  (*Id.* at p. 285.)  When Bowman's current offenses and prior serious/violent felony convictions (five armed robberies, two kidnappings, three rapes by force or fear, and other forcible sex crimes and armed offenses) are contrasted with the crimes at issue in *Rummel*, it readily appears the magnitude of Bowman's criminal activity far surpasses the magnitude of Rummel's crimes.  A claim that Bowman's sentence constitutes cruel and unusual punishment within the meaning of the Eighth Amendment fails.[24]

As we shall explain, based on Bowman's current crimes and criminal history, his sentence does not violate the prohibition against cruel or unusual punishment contained in California Constitution article I, section 17.

The basic test is whether the punishment is "so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424, fn. omitted.)  Successful challenges to proportionality are an "exquisite rarity."  (*People v. Weddle* (1991) 1 Cal.App.4th 1190, 1196.)

*In re Lynch* applied a three-pronged approach to determine whether a particular punishment is disproportionate to the offense for which it is imposed.  (*In re Lynch, supra,*

_____

[24]  We note that recently four members of the United States Supreme Court indicated they had questions about the constitutionality of a 25-year-to-life sentence under the three strikes law for a defendant whose current crime was petty theft with a prior, which would be a misdemeanor if it were the defendant's first theft crime. (See *Riggs v. California*, cert. den. (No. 98-5021, Jan. 19, 1999) 119 S.Ct. 890.)  This development does not necessarily bolster Bowman's argument that his functional life without the possibility of parole sentence constitutes cruel and unusual punishment because his current crimes were mere property crimes.  The distinguishing factor about *Riggs* is the petty nature of his crime; Bowman's current crimes are not comparable.

8 Cal.3d at pp. 429-437.)  Under the first prong, the court examines the "nature of the offense and/or the offender, with particular regard to the degree of danger both present to society."  (*Id.* at p. 425.)  Second, the court compares the challenged punishment with punishments prescribed for more serious crimes in the same jurisdiction.  (*Id.* at p. 426.)  Finally, the challenged punishment is compared with punishments for the same offense in other jurisdictions.  (*Id.* at p. 427.)

The Supreme Court in *People v. Dillon* (1983) 34 Cal.3d 441 refined the first prong of the *In re Lynch* analysis.  As to evaluating the nature of the offense, courts should examine "not only the offense in the abstract" but also "'the facts of the crime in question....'" (*Id.* at p. 479.)  Courts should consider the "totality of the circumstances," including motive, the way the crime was committed, the extent of the defendant's involvement, and the consequences of the defendant's acts.  (*Ibid.*)  With respect to the nature of the offender, a court should ask whether "the punishment is grossly disproportionate to the defendant's individual culpability as shown by such factors as his age, prior criminality, personal characteristics, and state of mind." (*Ibid.*)

The analysis developed in *In re Lynch* and *People v. Dillon* merely provides guidelines for determining whether a given punishment is cruel or unusual and the importance of each prong depends on the facts of the specific case.  (*In re DeBeque* (1989) 212 Cal.App.3d 241, 249.)  The defendant has the burden of establishing that his punishment is greater than that imposed for more serious offenses in California and that similar offenses in other states do not carry punishments as severe.  (See *id.* at pp. 254-255.)

With the above principles in mind, we consider the nature of the offenses and the offender.  Bowman argues his sentence, which effectively is life without the possibility of parole, constitutes cruel and unusual punishment because no one was physically injured.  We are not persuaded by Bowman's attempts to minimize the seriousness of his current crimes, which victimized a large number of people.  Moreover, Bowman is not subject to a life sentence under the three strikes law merely on the basis of his current offenses; rather, it is on the basis of his recidivist behavior.

Recidivism in the commission of multiple felonies poses a manifest danger to society justifying the imposition of longer sentences for subsequent offenses.  (See *People v. Karsai* (1982) 131 Cal.App.3d 224, 242 [recidivist statute for violent sex offenders], overruled on other grounds in *People v. Jones* (1988) 46 Cal.3d 585, 600, fn. 8.)  In discussing recidivist statutes, the United States Supreme Court has stated:

53

> "The purpose of a recidivist statute . . . is . . . to deter repeat offenders and, at some point in the life of one who repeatedly commits criminal offenses serious enough to be punished as felonies, to segregate that person from the rest of society for an extended period of time. This segregation and its duration are based not merely on that person's most recent offense but also on the propensities he has demonstrated over a period of time during which he has been convicted of and sentenced for other crimes. Like the line dividing felony theft from petty larceny, the point at which a recidivist will be deemed to have demonstrated the necessary propensities and the amount of time that the recidivist will be isolated from society are matters largely within the discretion of the punishing jurisdiction." (*Rummel v. Estelle, supra,* 445 U.S. at pp. 284-285.)

Bowman's criminal career began in earnest in 1975, when at the age of 19, he took part in a series of armed robberies. His next big crime spree took place in 1982 -- within six months of being released on parole -- when the kidnappings, rapes and other sexual crimes took place. The trial court noted these crimes "involve[d] conduct that put other humans at great risk ... and show[ed] appalling disregard for the human dignity of the ... victims in those cases" and prison had not had any "rehabilitative effect" on him. The trial court aptly summed up Bowman's record up to that point as a "rather horrendous felony history."

When Bowman was released from prison in the early 1990s, his criminal lifestyle continued, albeit with less serious and violent offenses. After each incarceration, Bowman committed new crimes. As the trial court remarked:

> "[T]here hasn't been, in my view, a real significant period ... where he was free of criminality for any significant period of time. Over all these years he continued to offend.... [¶] I think it's fair to say... he's a failure on probation, failure on parole and a history of continued criminality now... more than 20 years."

Thus, at age 41, Bowman was before the court essentially as a career criminal who had preyed on society and failed to benefit from multiple incarcerations and periods of parole and probation. Given his history and his current crimes, the life without possibility of parole sentence did not constitute cruel or unusual punishment under the first prong of the *Lynch* test.

As to the second prong, we observe initially that it has long been accepted in this state that recidivism in the commission of multiple felonies poses a manifest danger to society, justifying the imposition of longer sentences for

subsequent offenses. (See *In re Rosencrantz* (1928) 205 Cal. 534, 535-536, 539-540; *People v. Karsai, supra,* 131 Cal.App.3d at p. 242; *People v. Weaver* (1984) 161 Cal.App.3d 119, 125-126.) In any event, a case-by-case comparison of Bowman's punishment for his current crimes with the punishment for other crimes in California is inapposite since it is his recidivism in combination with his current crime that places him under the three strikes law. Because the Legislature may constitutionally enact statutes imposing more severe punishment for habitual criminals, it is illogical to compare Bowman's punishment for his "offenses," which includes his recidivist behavior, to the punishment of others who have committed more serious crimes, but have not qualified as repeat felons. Other such offenders would likely receive similar or longer sentences under the new law if the law were applicable to them because of recidivist conduct.

With respect to the third *Lynch* prong concerning sentencing schemes in other jurisdictions, a comparison of other states' penal statutes for habitual criminals with the three strikes law provides support for concluding a life term as applied to Bowman is not cruel or unusual punishment. (See *Rummel v. Estelle, supra,* 445 U.S. 263; cf. *Borderkircher v. Hayes* (1978) 434 U.S. 357 [imposition of life imprisonment under recidivist statue for uttering a forged instrument in the amount of $88.30 upheld against vindictive prosecution claim].)

Thus, in light of Bowman's criminal history and current offenses, we cannot say that what is effectively a life sentence without the possibility of parole under the three strikes law either shocks the conscience or violates notions of human dignity. Rather, the application of this statute to Bowman results from the need to deter offenders, like him, who repeatedly commit such crimes and to segregate them from the rest of society. This does not constitute cruel or unusual punishment.

Lodgment 1 at 29-37. This Court must analyze whether this decision by the California Court of Appeal was contrary to, or an unreasonable application of, clearly established federal law. See 28 U.S.C. § 2254(d).

This Court does not accept Respondent's reasoning that "the implicit holding of Andrade is that a federal habeas court cannot find a state court ruling rejecting an 8th Amendment challenge to a sentence properly imposed under California's Three Strikes law contrary to, or

1  an unreasonable application of the Supreme Court's clearly-established
2  precedent." Answer at 28. However, similarly, the Court does not
3  accept Petitioner's argument that his sentence is grossly-
4  disproportionate because it was based primarily on non-violent,
5  "wobbler" theft offenses. Traverse at 20-27.

6      The threshold determination for the Court is whether Petitioner's
7  sentence is one of the rare cases in which a comparison of the crime
8  committed and the sentence imposed leads to an inference of gross
9  disproportionality. See Harmelin v. Michigan, 501 U.S. 957, 1005 (1991)
10 (Kennedy, J., concurring); Ewing v. California, 538 U.S. 11, 30-31
11 (2003) (applying Harmelin standard). Only if such an inference arises
12 does the court proceed to compare a petitioner's sentence with sentences
13 in the same and other jurisdictions. See Harmelin, 501 U.S. at 1005
14 (Kennedy, J., concurring); Ewing, 538 U.S. at 23 (noting that "Justice
15 KENNEDY's concurrence [in Harmelin] also stated that Solem 'did not
16 mandate' comparative analysis 'within and between jurisdictions'"). The
17 threshold for an "inference of gross disproportionality" is exceedingly
18 high. See, e.g., Ewing, 538 U.S. at 30 (sentence of twenty-five years-
19 to-life for conviction of grand theft—for shoplifting three golf
20 clubs—with prior convictions was not grossly disproportionate);
21 Harmelin, 501 U.S. at 1008-09 (mandatory sentence of life without
22 possibility of parole for first offense of cocaine possession did not
23 raise inference of gross disproportionality).

24     In this case, Petitioner argues that his sentence is grossly
25 disproportionate because he has been sentenced to life without parole
26 for conduct that with one exception (his conviction for being a felon
27 in possession of a firearm), constituted non-violent "wobbler" offenses
28 - offenses that could have been charged as misdemeanors. Traverse at

22.    This argument is unpersuasive for several reasons.  First, as the Court of Appeal noted, Petitioner's sentence is based on his recidivist behavior, not just the instant "wobbler" offenses.  Second, given the armed enhancements added to two of Petitioner's convictions, coupled with the felon in possession of a firearm conviction, Petitioner's most current crimes are not as non-violent as he suggests.  See Ramirez v. Castro, 365 F.3d 755, 770 (9th Cir. 2004) (citing Ewing, 538 U.S. at 51 (Breyer, J., dissenting)) (the Three Strikes Law was intended "to reduce 'crimes against the person, **crimes that create danger of physical harm**, and drug crimes, not to incapacitate those who commit petty or even serious property crimes") (emphasis added).  Finally, the sheer number of crimes Petitioner committed in the instant case, as well as the length of time during which he committed them, distinguishes him from defendants in other cases where the sentence was found to be grossly disproportionate.  See Solem v. Helm, 463 U.S. 277, 303 (1983) (affirming decision that sentence of life imprisonment without possibility of parole imposed for uttering no account $100 check and for six minor prior convictions violated Eighth Amendment); Ramirez, 365 F.3d at 756, 775 (affirming granting of habeas writ on Eighth Amendment grounds where court imposed 25 years to life sentence based on three shoplifting offenses); cf. United States v. Carr, 56 F.3d 38, 39 (9th Cir. 1995) (explaining that sentence of twenty-two years upon conviction for sale of 66.92 grams of cocaine base with enhancement under federal sentencing guidelines' career offender provision for two previous convictions for minor drug sales not grossly disproportionate).  Thus, the fact that Petitioner's offenses may have been "wobblers" and that some were non-violent in nature does not raise an inference of "gross disproportionality" in this case.

1    Petitioner further argues that his prior offenses do not justify

2  his sentence because he committed the robbery offenses twenty-one years

3  before the triggering offenses and his 1982 convictions for sexual

4  offenses were entered by way of a plea bargain through application of

5  vicarious liability.[25]  Traverse at 22-23 citing Ramirez, 365 F.3d at

6  768-69, 775 (analyzing facts underlying prior convictions in finding

7  sentence based, in part, on defendant's recidivism grossly

8  disproportionate).  The Court disagrees with Petitioner's implication

9  that his criminal history is insubstantial and/or not current.  Based

10  on this Court's review of Petitioner's criminal history, it appears that

11  he committed a nearly continuous string of significant offenses and that

12  he re-offended each time shortly after he was released from prison.[26]

13

14    [25]    As to the 1982 offense, Petitioner contends that the trial court

15  inappropriately discounted Petitioner's account of these offenses without evidence and

16  that, therefore, this Court should order expansion of the record as to those offenses.

17  Id. at 23 n. 9.  Post-conviction habeas relief is unavailable to a state prisoner who

18  "challenges a current sentence on the ground that it was enhanced based on an allegedly

    unconstitutional prior conviction for which the petitioner is no longer in custody."

19  Lackawanna County Dist. Attorney v. Coss, 532 U.S. 394, 396-97 (2001).  Furthermore,

20  because the record contains evidence sufficient to show the nature of the charges, the

    potential sentence terms, Petitioner's plea agreement and the actual prison term, the

21  Court finds that no expansion of the record is necessary in this case.  Accordingly,

22  this Court **RECOMMENDS** that Petitioner's request for expansion of the record be **DENIED**.

23    [26]    Based on data contained in the probation report, it appears that Petitioner

    was in custody at least from November 24, 1975 to April 16, 1980 (for robbery

24  convictions), from July 22, 1981 to September 20, 1981 (for violating parole), from

25  June 17, 1982 to January 16, 1988 (for kidnapping, rape, bribe to influence testimony,

    lewd act with a child, sodomy, and kidnapping for ransom), from June 17, 1994 to July

26  1995 (for two counts of unlawful driving or taking of vehicle, two counts of receiving

27  stolen property, failing to register as a sex offender, and failure to appear while on

28  bail), and from December 1995 to March 1996 (for violating parole).  Suppl. Lodgment

    1, vol. 1 at 163-66; see also vol.2 at 206-52.

03cv2224-BTM (BLM)

1    Furthermore, to the extent Petitioner relies on Ramirez, the facts of
2    his case are distinguishable.  In finding that Mr. Ramirez's criminal
3    history did not justify his sentence, the Ninth Circuit noted that his
4    two prior convictions for second-degree robbery were non-violent, did
5    not involve weapons, were based on a single plea agreement, resulted in
6    a short sentence (one year), and were punishable with time in jail
7    versus prison.  Ramirez, 365 F.3d at 768-69.  On the other hand,
8    Petitioner's prior convictions - even the rape and kidnapping-related
9    convictions to which he pled guilty - resulted in significant prison,
10   not jail, time (approximately eleven and a half years total) and in
11   several cases, involved violent felonies.  For these reasons, the Court
12   rejects   Petitioner's   argument   that   his   sentence   is   grossly
13   disproportionate to his prior offenses.[27]

14       In conclusion, this Court finds that the Court of Appeal thoroughly
15   compared the gravity of Petitioner's offenses with the harshness of his
16   sentence and appropriately concluded that his sentence does not raise
17   an inference of gross disproportionality.  This Court agrees with the
18   appellate court's conclusion and finds that Petitioner's sentence does
19   not violate the Eighth Amendment's prohibition against cruel and unusual
20   punishment.  Accordingly, this Court concludes that the California Court
21   of Appeal's decision was not contrary to or an unreasonable application
22   of clearly established Supreme Court precedent, nor did it constitute
23   an unreasonable factual determination.  See 28 U.S.C. § 2254(d).  For
24   these reasons, this Court **RECOMMENDS** that Petitioner's eighth claim for

25

26       [27]   Because the Court finds that a comparison of Petitioner's crimes to his
27   sentence does not lead to an inference of gross disproportionality, the Court need not
28   compare  Petitioner's  sentence  with  sentences  for  comparable  crimes  in  other
     jurisdictions.  See Harmelin, 501 U.S. at 1005.

1  habeas relief be **DENIED**.

2  **CONCLUSION AND RECOMMENDATION**

3     In sum, this Court finds that Petitioner has failed to present any

4  evidence suggesting that the California Court of Appeal's decision as

5  to his claim was contrary to, or an unreasonable application of, clearly

6  established federal law. See 28 U.S.C. § 2254(d). Nor has Petitioner

7  made any argument that further factual development is necessary, such

8  that an evidentiary hearing would be warranted. See 28 U.S.C. §

9  2254(e)(2) (exceptions where an evidentiary hearing may be appropriate).

10 As such, this Court **RECOMMENDS** that Petitioner's First Amended Petition

11 for Writ of Habeas Corpus be **DENIED** and the case dismissed with

12 prejudice.

13    For all the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the

14 District Court issue an Order: (1) approving and adopting this Report

15 and Recommendation, and (2) directing that Judgment be entered denying

16 the petition.

17    **IT IS HEREBY ORDERED** that any written objections to this Report

18 must be filed with the Court and served on all parties **no later than**

19 **February 9, 2007.** The document should be captioned "Objections to

20 Report and Recommendation."

21 ///

22 ///

23 ///

24 ///

25 ///

26 ///

27 ///

28 ///

1    **IT IS FURTHER ORDERED** that any reply to the objections shall be

2    filed with the Court and served on all parties **no later than** <u>**March 2,**</u>

3    <u>**2007.**</u>   The parties are advised that failure to file objections within

4    the specified time may waive the right to raise those objections on

5    appeal of the Court's order.  <u>See</u> <u>Turner v. Duncan</u>, 158 F.3d 449, 455

6    (9th Cir. 1998).

7

8    Dated: **1/19/07**

9                                          BARBARA L. MAJOR

                                            United States Magistrate Judge

10

11

12

13   COPY TO:

14   HONORABLE BARRY TED MOSKOWITZ

     UNITED STATES DISTRICT JUDGE

15

16   ALL COUNSEL

17

18

19

20

21

22

23

24

25

26

27

28

03cv2224-BTM (BLM)